**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KAREN CASTON-PALMER,<br>individually and on behalf of the<br>defined class,<br><br>　　　　　　Plaintiff,<br><br>　　-vs-<br><br>NCO PORTFOLIO MANAGEMENT,<br>INC.,<br><br>　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Judge Kennelly<br><br>Case No.:　　08 C 2818<br><br>Magistrate Judge Valdez |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Defendant, NCO Portfolio Management, Inc. (NCO), through counsel and pursuant to Fed. R. Civ. P. 56, hereby moves this Honorable Court for entry of summary judgment in its favor and against Plaintiff, Karen Caston-Palmer. In support thereof, NCO states as follows:

**I.　　Introduction**

Plaintiff has initiated this 3-count class action lawsuit[1] seeking redress for the allegedly unlawful collection activities of NCO. Count I alleges that NCO violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*. (FDCPA), Count II is premised on Illinois' Collection Agency Act, 225 ILCS 425 *et seq*. (ICAA), and Count III claims that NCO violated the Illinois Consumer Fraud Act, 815 ILCS 505/2 (ICFA). Though predicated on 3 different statutes, the gravamen of Plaintiff's claims is the

---

[1] The class has not been certified under FED.R.CIV.P. 23.

assertion that NCO brought a collection lawsuit to recover a debt for which NCO did not have lawful title. *Plaintiff's Complaint,* ¶ 1. (A copy of Plaintiff's Complaint is attached hereto as Exhibit A.) Plaintiff also alleges that NCO brought suits despite not having an assignment as required by § 8b of the ICAA and thereby violated the Illinois Code of Civil Procedure, which requires that the assignment be attached to the complaint. *Id.*, ¶ ¶ 26 - 27.

Plaintiff's claims fail as a matter of law for 3 reasons. First, § 8b of the ICAA does not apply because NCO was the lawful owner of Plaintiff's debt and was not a collection agency. Second, even if it fell within the coverage of the ICAA, NCO had the requisite assignment and the lawsuit filed was an attempt to collect a valid, enforceable debt to which it owned title based on the purchase of the account from the original creditor. Finally, contrary to Plaintiff's allegations, the failure to comply with the pleading requirements of the Illinois Code of Civil Procedure does not constitute an FDCPA, ICAA or ICFA violation.

## II.    Procedural History

Plaintiff filed this putative class action lawsuit on May 15, 2008. NCO's answer was filed on July 9, 2008. This motion has followed.

## III.    Standard of Review

When moving for summary judgment, a party must satisfy the requirements of Federal Rule of Civil Procedure 56. *Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.,* 427 F.3d 1038, 1041 (7th Cir. 2005). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Adelman-Reyes v. Saint Xavier Univ.,* 500 F.3d 662, 665 (7th Cir. 2007). A genuine issue of material fact exists only when, in viewing the record and all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir. 1995). The movant has the burden of establishing there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If the movant satisfies this burden, the non-movant cannot rely on unsupported factual allegations, but must set forth specific facts supported by admissible evidence that establish a genuine issue for trial. *Celotex,* 477 U.S. at 324; *Batish v. Cook County,* 241 F.3d 919, 926 (7th Cir. 2001). Therefore, to avoid summary judgment, a non-movant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists. *Pugh v. City of Attica,* 259 F.3d 619, 625 (7th Cir. 2001).

**IV.    Material Facts Not In Dispute**

NCO has filed along with this motion a Statement of Material Facts pursuant to Local Rule 56.1. That statement of facts is incorporated herein by reference. Attached hereto as Exhibit B is a copy of the Affidavit of Anthony Albanese, which is referenced in NCO's Local Rule 56.1 Statement.

## V.    Argument

Plaintiff contends that NCO violated the FDCPA, ICAA, and ICFA by attempting to collect a debt that it did not own and attempts to impose liability on NCO for 3 errors allegedly committed in the filing of a state court collection lawsuit against Plaintiff. According to Plaintiff, the failures giving rise to liability were:

1.    A failure to have an assignment under § 8b of the ICAA (*Plaintiff's Complaint,* ¶ ¶ 9 – 10);

2.    A failure to attach the assignment to the complaint as required by 735 ILCS § 606 (*Id.*, ¶ 11); and

3.    NCO's failure to comply with 735 ILCS § 5/2-403(a), which requires a party "in his or her pleading on oath allege that he or she is the actual bona fide owner thereof, and set forth how and when he or she acquired title." (*Id.*, ¶ 12).

Plaintiff's claims are without merit. NCO is not a "collection agency" subject to the ICAA. Even if NCO fell within the coverage of the ICAA, NCO complied with that Act when it purchased Plaintiff's debt pursuant to a written sales agreement, acquiring all rights, title and interest to Plaintiff's account from the original creditor. Plaintiff's FDCPA and ICFA claims are derivative of the alleged ICAA violation, and similarly fail because NCO did not violate the ICAA. Finally, NCO's alleged violations of the Illinois Rules of Civil Procedure do not support a claim under the FDCPA, or any other law.

### A. Section 8b Of The ICAA Only Applies To Assignments For Collection

The assignment requirements of the ICAA do not apply to NCO because it was not an assignee for collection. Plaintiff has alleged that the ICAA was recently amended to "define debt buyers as 'collection agencies,'" thereby making the assignment requirements of § 8b of the ICAA applicable to debt buyers such as NCO. *Plaintiff's Complaint, ¶ 9.* Plaintiff's assertion relies on an incomplete and incorrect interpretation of the ICAA that ignores the distinction between an assignment for collection and a beneficial assignment that transfers full ownership. Section 8b of the ICAA states:

Assignment for Collection

§ 8b. **Assignment for collection**. An account may be assigned to a collection agency for collection <u>with title passing to the collection agency to enable collection of the account in the agency's name as assignee for the creditor</u> provided…

*225 ILCS 425/8b (emphasis added).*

By definition, the "special assignment requirements" of § 8b of the ICAA apply only to assignments for collection. An assignment for collection is one that transfers legal title, and not full ownership, to the assignee. *Sprint Communications Co., L.P. v. APCC Services, Inc.,* ___ S.Ct. ___, 2008 WL 2484712, *11 (2008). With an assignment for collection, beneficial ownership is not transferred to the assignee. Instead, only legal title is transferred to the assignee to allow the assignee to collect the debt assigned. *Ecker v. Big Wheels, Inc.,* 136 Ill.App.3d 651, 654, 483 N.E.2d 639, 642 (Ill. App. 4th Dist. 1985).

Section 8b is expressly limited to assignments for collection where title is transferred to allow the collection agency to collect the debt on behalf of the creditor. Section 8b does not apply in situations, like here, where all of the rights and ownership are transferred to an assignee. Plaintiff's account was sold to NCO and NCO inherited all of the rights of ownership to that account. *See Affidavit of Anthony Albanese, ¶ 9.* Plaintiff acknowledges this point in her complaint, alleging that "NCO is a debt buyer" (*Complaint, ¶ 13*) "engaged in the business of purchasing charged-off consumer debts and enforcing the debts against the consumers" (*Complaint, ¶ 20*), including the debt of Plaintiff (*Complaint, ¶ 25*). NCO was a debt purchaser and beneficial assignee, not an assignee for collection.

The language of § 8b evidences the intent to exclude beneficial assignees like NCO from its coverage by stating that the collection activities being regulated are those performed "for the creditor." *225 ILCS 425/8b.* In this case, NCO was not collecting the debt for the benefit of the assignor/creditor; the debt was owned by and being collected for the benefit of NCO. The "for the creditor" language would be rendered superfluous, an obvious breach of the rules of statutory construction, if a beneficial assignee is included within § 8b, as suggested by Plaintiff. *Matter of Lifschultz Fast Freight Corp.,* 63 F.3d 621, 628 (7th Cir. 1995).

## B.    NCO Is Not A Collection Agency Under the ICAA

NCO is also not regulated by the ICAA because it is not a "collection agency." The ICAA defines a "collection agency" as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection."

- 6 -

*225 ILCS 425/2.* "Debt collection" is defined as an "act or practice in connection with the collection of consumer debts." *Id.* NCO does not engage in debt collection and undertook no "acts or practices" to collect Plaintiff's purchased consumer debt—all collection efforts at issue here were undertaken by NCO's collection counsel. *See Affidavit of Anthony Albanese,* ¶ 3.

The ICAA articulates when a company is acting as a collection agency. *See 225 ILCS 425/3.* That chapter provides that

> A person, association, partnership, corporation, or other legal entity acts as a collection agency when he or it:
>
> (a)    Engages in the business of collection for others of any account, bill or other indebtedness;
>
> (b)    Receives, by assignment or otherwise, accounts, bills, or other indebtedness from any person owning or controlling 20% or more of the business receiving the assignment, with the purpose of collecting monies due on such account, bill or other indebtedness;
>
> (c)    Sells or attempts to sell, or gives away or attempts to give away to any other person, other than one registered under this Act, any system of collection, letters, demand forms, or other printed matter where the name of any person, other than that of the creditor, appears in such a manner as to indicate, directly or indirectly, that a request or demand is being made by any person other than the creditor for the payment of the sum or sums due or asserted to be due;
>
> (d)    Buys accounts, bills or other indebtedness and engages in collecting the same; or
>
> (e)    Uses a fictitious name in collecting its own accounts, bills, or debts with the intention of conveying to the debtor that a third party has been employed to make such collection.
>
> *Id.*

In this case, there is no evidence that NCO engages in any of the enumerated activities that would bring it within the definition of a collection agency. Instead, NCO is simply a passive debt buyer that does not actively partake in debt collection. *See Affidavit of Anthony Albanese,* ¶ 3. Due to its role as a passive debt buyer, NCO instead refers the purchased debts to either licensed collection agencies or collection attorneys to recover the debt. *Id.* Plaintiff's claims fail because a debt buyer such as NCO that does not affirmatively engage in collection activities is not regulated by the ICAA.

### C. The ICAA Was Not Violated Because Plaintiff's Debt Was Properly Assigned To NCO

Assuming, *arguendo,* that the ICAA did guide NCO's activities, Plaintiff's claims still fail because NCO has a valid, written assignment that complied with the Act. Plaintiff's claims that NCO attempted to collect a debt to which it did not own is demonstrably false. *Affidavit of Anthony Albanese,* ¶ 9.

An "assignment" is the transfer of some property, claim, or right from assignor to assignee. *City of Chicago Heights v. Old Orchard Bank Trust Co.,* 422 N.E.2d 69 (Ill.App. 1st Dist. 1981). An assignment, "oral or written, occurs when there is a transfer of some identifiable interest from the assignor to the assignee." *Northwest Diversified, Inc. v. Desai,* 353 Ill.App.3d 378, 387, 818 N.E.2d 753, 761 (Ill.App. 1st Dist. 2004) quoting *Klehm v. Grecian Chalet, Ltd.,* 164 Ill.App.3d 610, 616, 115 Ill.Dec. 662, 518 N.E.2d 187 (1987). The "creation and existence of an assignment is to be determined according to the intention of the parties." *Rivan Die Mold Corp. v. Stewart-Warner Corp.,* 26 Ill.App.3d 637, 642, 325 N.E.2d 357 (1975). Whether a proper assignment has

occurred "is dependent upon proof of intent to make an assignment and that intent must be manifested." *Strosberg v. Brauvin Realty Services, Inc.,* 295 Ill.App.3d 17, 30, 229 Ill.Dec. 361, 691 N.E.2d 834 (1998).

No particular words are required to create a valid assignment, so long as the intent to assign is evident. *Community Bank of Greater Peoria v. Carter*, 669 N.E.2d 1317 (Ill.App. 1st Dist. 1996). Any document which sufficiently evidences the intent of an assignor to vest ownership of a subject matter of the assignment in an assignee is sufficient to effect an assignment. *Department of Transportation v. Heritage-Pullman Bank and Trust Co.*, 627 N.E.2d 191 (Ill.App. 1st Dist. 1993). If a valid assignment has occurred, "the assignee acquires all of the interest of the assignor in the property that is transferred." *Buck v. Illinois National Bank & Trust Co.,* 79 Ill.App.2d 101, 106, 223 N.E.2d 167 (1967).

Here, the undisputed facts establish that the Purchase Agreement between Citibank and NCO was adequate to vest proper title to Plaintiff's account with NCO. The Purchase and Sale Agreement between NCO and Citibank was in writing, contained an effective date of the assignment of rights, title and interest to NCO and the consideration for the agreement. *See Affidavit of ¶ Anthony Albanese 5; see also Exhibit 1 to Anthony Albanese's Affidavit*. Through the Agreement, Citibank sold, transferred, and assigned to NCO "all right, title and interest" held by Citibank related to Plaintiff's account debt. *See Affidavit of Anthony Albanese, ¶ 9; see also Exhibit 1 to Anthony Albanese's affidavit, ¶* 2.1. The Agreement further provided that NCO would "assume, with respect to each Account, all of [Citibank's] rights, responsibilities and obligations." *Id, ¶ 2.4.*

The above establishes that a valid assignment of Plaintiff's debt occurred, assigning to NCO the rights to collect the outstanding debt and interest of Plaintiff owing to Citibank. There was no violation of the "special assignment requirements" of § 8b.

Plaintiff's claims pursuant to the FDCPA and ICFA are predicated on the alleged violations of the ICAA. Plaintiff has not alleged that the NCO's collection activities were otherwise false, deceptive, misleading, or unfair. As discussed above, there was no violation of the ICAA in this case. Therefore, Plaintiff's remaining claims under the FDCPA and ICFA must also be rejected.

### D.     The FDCPA Does Not Impose Liability For Failing To Comply With State Procedural Rules

Plaintiff's final assertion is that NCO unlawfully attempted to collect the debt because it failed to attach the assignment to the state court collection case, and failed to allege in that complaint that it was the bona fide owner of Plaintiff's debt, as required by the Illinois Code of Civil Procedure. *Plaintiff's Complaint, ¶ ¶ 11 -12.*

Neither the ICAA nor the ICFA requires an assignment to be attached to a complaint. The sole basis for this requirement arises from the Illinois Code of Civil Procedure. *See 735 ILCS § 606* ("If a claim or defense is founded upon a written instrument, a copy thereof, or of so much of the same as is relevant, must be attached to the pleading as an exhibit…") and *735 ILCS § 5/2-403(a)* (requiring a party "in his or her pleading on oath allege that he or she is the actual bona fide owner thereof, and set forth how and when he or she acquired title."). Plaintiff attempts to elevate the failure of NCO to comply with these pleading rules into an FDCPA violation.

Federal courts have repeatedly refused this invitation to allow the FDCPA to be utilized as a mechanism to enforce state law. *See, e.g., Beler v. Blatt, Hasenmiller, Leibsker & Moore*, 480 F.3d 470, 474 (7th Cir. 2007); *Olvera v. Blitt & Gaines*, 431 F.3d 285, 287 (7th Cir. 2005). Instead, when a state rule is violated, the state law should be applied to remedy that violation. *Id.* Here, Plaintiff's remedy was to move to dismiss NCO's collection complaint for failing to comply with the pleading requirements, thereby affording NCO an opportunity to cure any technical defects. Instead, Plaintiff has run to federal court to seek redress for violations of Illinois' procedural rules. The FDCPA does not sanction such a claim. *Id.*; *Wade v. Regional Credit Association*, 87 F.3d 1098, 1100 (9th Cir. 1996) (failure to comply with a state registration requirement for collection agencies is not a violation the FDCPA); and *Rice v. Great Seneca Financial Corp.*, 2008 WL 2169162, *5 (S.D. Ohio 2008) (debt collectors failure to attach all of the original creditor's documents to a state court pleading did not violate the FDCPA). *Cf. Pierce v. Steven T. Rosso, P.A..*, 2001 WL 34624006, *1 (D. Minn. 2001) (defendant's failure to strictly comply with Minnesota's Rules of Civil Procedure related to service of process in a collection lawsuit did not state a claim under the FDCPA).

The FDCPA's goal is to stop collection practices that are false, deceptive, or misleading or that are unfair or unconscionable. *See 15 U.S.C. § 1692e and § 1692f; see also Beler*, 480 F.3d at 473. A failure to comply with the technical pleading requirements of the Illinois Code of Civil Procedure is not such a practice.

## VI.    Conclusion

WHEREFORE, Defendant NCO respectfully requests that this Honorable Court enter an Order granting summary judgment in its favor and against Plaintiff, for the attorney fees and costs incurred in preparing this motion and for all other just and equitable relief.

Respectfully submitted,

/s/ James K. Schultz
Attorney for Defendant NCO

James K. Schultz
Shannon M. Geier
SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.P.
55 West Monroe, Suite 1120
Chicago, IL 60603
Telephone:    (312) 578-0990
Facsimile:    (312) 578-0991
jschultz@sessions-law.biz
sgerier@sessions-law.com

David Israel, Esq.
SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.P.
Lakeway Two, Suite 200
3850 N. Causeway Boulevard
Telephone: 504-828-3700
Facsimile: 504-828-3737
disrael@sessions-law.biz

Counsel for Defendant NCO Portfolio Management, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KAREN CASTON-PALMER,<br>individually and on behalf of the<br>defined class, | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | Judge Kennelly |
| -vs- | )<br>) | Case No.:    08 C 2818 |
| NCO PORTFOLIO MANAGEMENT,<br>INC., | )<br>)<br>)<br>) | Magistrate Judge Valdez |
| Defendant. | ) | |

### CERTIFICATE OF SERVICE

I certify that on this 13th day of August, 2008, a copy of the foregoing

**Memorandum of Law in Support of Defendant's Motion for Summary Judgment**

was filed electronically in the ECF system.  Notice of this filing will be sent to the parties

of record by operation of the Court's electronic filing system, including Plaintiff's

counsel as described below.  Parties may access this filing through the Court's system.

> Daniel A. Edelman
> Cathleen M. Combs
> James O. Latturner
> Thomas E. Soule
> EDELMAN, COMBS, LATTURNER & GOODWIN, L.L.C.
> 120 South LaSalle Street
> 18th Floor
> Chicago, Illinois  60603

/s/ James K. Schultz
Attorney for Defendant NCO

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KAREN CASTON-PALMER,                    )
also known as KAREN CASTON,             )
individually and on behalf of the class )
defined herein,                         )
                                        )
          Plaintiff,                    )       **FILED: MAY 15, 2008**
                                        )       **08CV2818              AEE**
     vs.                                )       **JUDGE KENNELLY**
                                        )       **MAGISTRATE JUDGE VALDEZ**
NCO PORTFOLIO MANAGEMENT, INC.,         )
                                        )
          Defendant.                    )

## COMPLAINT – CLASS ACTION

## MATTERS COMMON TO MULTIPLE CLAIMS

### INTRODUCTION

1.    This action seeks redress for the conduct of defendant, a debt buyer, in filing collection actions on purported debts to which it did not have lawful title.

2.    There is a substantial problem with debt buyers suing on debts that they do not own and have no right to sue on.

3.    There are multiple reported cases in which debtors have been subjected to litigation because they "settled" with A and then B claimed to own the debt. Smith v. Mallick, 514 F.3d 48 (D.C.Cir. 2008) (commercial debt purchased and resold by debt buyer, debt buyer [possibly fraudulently] settles debt it no longer owns, settlement held binding because notice of assignment not given, but obligor subjected to litigation as result). See also, Miller v. Wolpoff & Abramson, LLP, 1:06-CV-207-TS, 2008 U.S. Dist. LEXIS 12283 (N.D.Ind., Feb. 19, 2008), where a debtor complained he had been sued twice on the same debt; Dornhecker v. Ameritech Corp., 99 F. Supp. 2d 918, 923 (N.D.Ill. 2000), where the debtor claimed he settled with one agency and was then dunned by a second for the same debt, and Northwest Diversified, Inc. v. Desai, 353 Ill.App.3d 378, 818 N.E.2d 753 (1st Dist. 2004), where a commercial debtor paid the

1



creditor only to be subjected to a levy by a purported debt buyer.

       4.     In <u>Wood v. M&J Recovery LLC</u>,. CV 05-5564, 2007 U.S. Dist. LEXIS 24157 (E.D.N.Y., April 2, 2007), a debtor complained of multiple collection efforts by various debt buyers and collectors on the same debt, and the defendants asserted claims against one another disputing the ownership of the portfolio involved.  Shekinah alleged that it sold a portfolio to NLRS, that NLRS was unable to pay, that the sale agreement was modified so that NLRS would only obtain 1/5 of the portfolio, and that the 1/5 did not include the plaintiff's debt. Portfolio claimed that it and not Shekinah is the rightful owner of the portfolio.

       5.     In <u>Associates Financial Services Co. v. Bowman, Heintz, Boscia & Vician, P.C.</u>, IP 99-1725-C-M/S, 2001 U.S. Dist. LEXIS 7874, *9-12 (S.D.Ind., April 25, 2001), later opinion, 2004 U.S. Dist. LEXIS 6520 (S.D. Ind., Mar. 31, 2004), allegations were made that a creditor had continued to collect accounts allegedly sold to a debt buyer.

       6.     An article that appeared in the trade press shortly before the extension of the Illinois Collection Agency Act to debt buyers stated:

> More collection agencies are turning to the debt resale market as a place to pick up accounts to collect on. Too small to buy portfolios directly from major credit issuers, they look to the secondary market where portfolios are resold in smaller chunks that they can handle.
>
> But what they sometimes find in the secondary market are horror stories: The same portfolio is sold to multiple buyers; the seller doesn't actually own the portfolio put up for sale; half the accounts are out of statute; accounts are rife with erroneous information; access to documentation is limited or nonexistent. . . . .

Corinna C. Petry, <u>Do Your Homework: Dangers often lay hidden in secondary market debt portfolio offerings. Here are lessons from the market pros that novices can use to avoid nasty surprises</u>, Collections & Credit Risk, March 2007, pg. 24 Vol. 12 No. 3.

       7.     Courts have also dismissed  numerous collection and foreclosure lawsuits filed in the names of entities that did not own the purported debts.   <u>In re Foreclosure Cases</u>, 1:07CV2282 and 14 others, 2007 U.S. Dist. LEXIS 84011, 2007 WL 3232430 (N.D. Ohio Oct. 31, 2007); <u>In re Foreclosure Cases</u>, 07-cv-166 and 18 others, 2007 U.S. Dist. LEXIS 90812 (S.D.

Ohio Nov. 27, 2007); <u>In re Foreclosure Cases</u>, 521 F. Supp. 2d 650 (S.D.Ohio. 2007); <u>In re Foreclosure Cases</u>, 07-cv-166 and 14 others, 2007 U.S. Dist. LEXIS 95673 (S.D.Ohio, Dec. 27, 2007); <u>NovaStar Mortgage, Inc.  v. Riley</u>, 3:07-CV-397, 2007 U.S. Dist. LEXIS 86216 (S.D.Ohio, Nov. 21, 2007); <u>NovaStar Mortgage, Inc.  v. Grooms</u>, 3:07-CV-395, 2007 U.S. Dist. LEXIS 86214 (S.D.Ohio., Nov. 21, 2007); <u>HSBC Bank USA v. Rayford</u>, 3:07-CV-428, 2007 U.S. Dist. LEXIS 86215 (S.D.Ohio., Nov. 21, 2007); <u>Everhome Mtge. Co. v. Rowland</u>, 2008 Ohio 1282; 2008 Ohio App. LEXIS 1103 (Ohio App. March 20, 2008) (judgment for plaintiff reversed because it failed to introduce assignment or establish that it was the holder of the note and mortgage); <u>Deutsche Bank National Trust Co. v. Castellanos</u>, 277/07, 2008 NY Slip Op 50033U; 18 Misc. 3d 1115A; 2008 N.Y. Misc. LEXIS 44; 239 N.Y.L.J. 16 (Kings Co., N.Y., Sup. Ct., Jan. 14, 2008); <u>HSBC Bank USA, N.A. v. Valentin,</u> 15968/07, 2008 NY Slip Op 50164U; 14 Misc. 3d 1123A; 2008 N.Y. Misc. LEXIS 229 (Kings Co., N.Y., Sup. Ct., January 30, 2008); <u>HSBC Bank USA, N.A., v. Cherry</u>, 21335/07, 2007 NY Slip Op 52378U; 18 Misc. 3d 1102A; 2007 N.Y. Misc. LEXIS 8279; 239 N.Y.L.J. 2 (Kings Co., N.Y. Sup. Ct., Dec.  17, 2007); <u>Deutsche Bank National Trust Co. v. Castellanos,</u> 15 Misc. 3d 1134A; 841 N.Y.S.2d 819 (Kings. Co., N.Y. Sup. Ct. 2007).

       8.    Debt buyer American Acceptance has a lawsuit pending  alleging that a broker of charged-off debts sold it debts to which it did not have title.  <u>American Acceptance Co. v. Goldberg</u>, 2:08cv9 (N.D.Ind.).  Another debt buyer, Hudson & Keyse, filed suit alleging that the same debt broker obtained information about consumer debts owned by Hudson & Keyse and used the information to try to collect the debts for its own account, even though it didn't own them.  <u>Hudson & Keyse, LLC v. Goldberg & Associates, LLC</u>, 07-81047-civ (S.D.Fla., filed Nov. 5, 2007).  A similar suit, alleging that the broker resold accounts it did not own, was filed by Old National Bank (<u>Old National Bank v. Goldberg & Associates</u>, 9:08-cv-80078-DMM (S.D.Fla., Jan. 24, 2008).  The same debt broker is accused in another complaint of selling 6,521 accounts totaling about $40 million face value which it did not own. <u>RMB Holdings, LLC v. Goldberg &</u>

Associates, LLC, 3:07-cv-00406 (E.D.Tenn., filed Oct. 29, 2007).  Other debt buyers have voiced

similar complaints.  "Florida Broker Faces Multiple Lawsuits," Collections & Credit Risk, April

2008, p. 8.

        9.      In order to protect Illinois residents against this sort of abuse, the Illinois

Collection Agency Act ("ICAA") was amended effective January 1, 2008 to define debt buyers as

"collection agencies".  This makes applicable the special assignment requirements in ICAA §8b,

225 ILCS 425/8b.  Illinois courts had held prior to the amendment that a party that was required

to but did not have such an assignment does not have a valid claim and that the defendant in such

a case is entitled to judgment.  Business Service Bureau, Inc. v. Webster, 298 Ill. App. 3d 257;

698 N.E.2d 702 (4th Dist. 1998).

        10.     Section 8b of the ICAA provides:

> **Sec. 8b.  An account may be assigned to a collection agency for collection with title passing to the collection agency to enable collection of the account in the agency's name as assignee for the creditor provided:**
>
> > **(a) The assignment is manifested by a written agreement, separate from and in addition to any document intended for the purpose of listing a debt with a collection agency. The document manifesting the assignment shall specifically state and include:**
> >
> > > **(i) the effective date of the assignment; and**
> > >
> > > **(ii) the consideration for the assignment.**
> >
> > **(b) The consideration for the assignment may be paid or given either before or after the effective date of the assignment. The consideration may be contingent upon the settlement or outcome of litigation and if the claim being assigned has been listed with the collection agency as an account for collection, the consideration for assignment may be the same as the fee for collection.**
> >
> > **(c) All assignments shall be voluntary and properly executed and acknowledged by the corporate authority or individual transferring title to the collection agency before any action can be taken in the name of the collection agency.**
> >
> > **(d) No assignment shall be required by any agreement to list a debt with a collection agency as an account for collection.**
> >
> > **(e) No litigation shall commence in the name of the licensee as plaintiff unless: (i) there is an assignment of the account that satisfies the**

**requirements of this Section and (ii) the licensee is represented by a licensed attorney at law. . . .**

11.     Furthermore, the assignment must be attached to the complaint. <u>Candice Co. v. Ricketts</u>, 281 Ill.App.3d 359, 362, 666 N.E.2d 722 (1st Dist. 1996).

12.     Finally, the assignee is required "in his or her pleading on oath allege that he or she is the actual bona fide owner thereof, and set forth how and when he or she acquired title. . . . "   735 ILCS 5/2-403(a).

13.     Defendant NCO Portfolio Management, Inc., a debt buyer regulated by the ICAA since January 1, 2008, systematically files collection lawsuits without compliance with ICAA §8b and, therefore, without valid claims.

14.     In this action, plaintiff complains that such practice violates both the Fair Debt Collection Practices Act, 15 U.S.C. §§1692e and 1692f,  and ICAA §9.

## VENUE AND JURISDICTION

15.     This Court has jurisdiction under 15 U.S.C. §1692k (FDCPA), 28  U.S.C. §1331, 28 U.S.C. §1337, and 28 U.S.C. §1367.

16.     Venue and personal jurisdiction in this District are proper because:

    a.     Defendant's collection communications and activities impacted plaintiff within this District;

    b.     Defendant does business or is located within this District.

## PARTIES

17.     Plaintiff is an individual who resides in the Northern District of Illinois.

18.     Defendant NCO Portfolio Management, Inc. is a corporation chartered under Delaware law.

19.     Defendant NCO Portfolio Management, Inc. does business in Illinois.  Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, IL 60604.

20.     Defendant NCO Portfolio Management, Inc. is engaged in the business of

purchasing charged-off consumer debts and enforcing the debts against the consumers.

Defendant states on its Web site, http://www.ncogroup.com/industries/finance/port_mgmt.aspx,

that "NCO Portfolio Management is ranked among the top 10 debt purchasers and serves

numerous domestic and international market sectors, including financial services, health care,

telecommunications, and utilities."

      21.    On information and belief, defendant NCO Portfolio Management, Inc.

pays an average of less than ten cents on the dollar for the debts it purchases. The report on SEC

Form 10-K filed by its parent NCO Group, Inc., for the year ending December 31, 2007 states

(original page 9):

> Portfolio Management
>
> Our Portfolio Management business segment purchases and manages portfolios of
> purchased accounts receivable. With over 20 years of experience and an internal
> database of over 350 million customer accounts, the breadth of our ARM business
> provides unique insight into a wide variety of credit portfolios. As a result, we are
> able to adopt more disciplined and successful pricing strategies. Additionally, our
> scale and proprietary valuation techniques, supported by a significant amount of
> historical collection data, give us critical competitive differentiation in purchasing
> receivables. As customers tend towards offering larger portfolios, larger
> participants such as ourselves are better positioned to gain market share.
>
>  Our portfolios of purchased accounts receivable consist primarily of delinquent
> consumer accounts receivable, which represent the unpaid debts of individuals to
> consumer creditors such as banks, finance companies, retail merchants, utilities,
> healthcare companies, and other consumer-oriented companies. We typically
> purchase accounts that are 36 to 60 months past due. In 2007, we purchased an
> aggregate of $5.9 billion of delinquent consumer accounts receivable for a cost of
> $125.3 million. Collection services for the portfolios are primarily provided by
> Portfolio Management by our ARM business segment. We ranked among the top
> 10 debt purchasers, according to data gathered by Credit & Collections World, an
> online industry news source, based on 2006 revenues.

      22.    Defendant NCO Portfolio Management, Inc. regularly uses the mails and

telephones to collect debts.

      23.    Defendant NCO Portfolio Management, Inc. has been the plaintiff in more

than 100 lawsuits filed in Illinois since January 1, 2008 and seeking to collect consumer debts.

      24.    Because the purported obligations were originally owed to other entities

and were charged off prior to purchase,  NCO Portfolio Management, Inc. is a "debt collector" as
defined in the FDCPA.

### FACTS RELATING TO PLAINTIFF

25.     On or about April 11, 2008, NCO Portfolio Management, Inc. filed suit
against plaintiff Karen Caston-Palmer (under the name Karen Caston) in the Circuit Court of
Cook County to collect a purported debt incurred for personal, family or household purposes.
NCO Portfolio Management, Inc. claimed to have purchased the debt.

26.     The complaint did not attach any sort of assignment.

27.     On information and belief, defendant did not have an assignment that
complied with §8b of the Collection Agency Act.

28.     Defendant therefore did not have any sort of valid claim and knew or
should have known that it did not have a valid claim.

### FACTS  – GENERAL

29.     Defendant NCO Portfolio Management, Inc. regularly files lawsuits on
debts it claims to have purchased without having an assignment that complies with §8b of the
Collection Agency Act, and therefore, without a valid claim.

30.     Defendant knows or should know it has no valid claim, but files suit
anyway because consumers are unlikely to realize the fact.

31.     On information and belief, based on a computer search of court records,
defendant has filed over 100 such lawsuits.

### CLASS ALLEGATIONS

32.     Plaintiff brings this action on behalf of a class, pursuant to Fed.R.Civ.P.
23(a) and 23(b)(3).  The class consists of (a) all individuals (b) against whom defendant NCO
Portfolio Management, Inc. filed a collection lawsuit (c) in Illinois (d) subsequent to January 1,
2008, (e) without attaching to the complaint an assignment that complied with §8b of the ICAA.

33.     The class is so numerous that joinder of all members is not practicable.

7

34.    On information and belief, there are at least 40 individuals against whom defendant NCO Portfolio Management, Inc. filed a collection lawsuit in Illinois subsequent to January 1, 2008, without attaching to the complaint an assignment that complied with §8b of the ICAA.

35.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a.    Whether defendant engages in a practice of filing lawsuits without attaching to the complaint an assignment that complied with §8b of the ICAA.

b.    Whether such lawsuits are therefore subject to a defense of which defendant knows or should know about.

c.    Whether such practice is an unfair or deceptive.

d.    Whether defendant violates the ICAA.

36.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

37.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and FDCPA litigation.

38.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.    Individual actions are not economically feasible.

b.    Members of the class are likely to be unaware of their rights;

c.    Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

### COUNT I – FAIR DEBT COLLECTION PRACTICES ACT

39.    Plaintiff incorporates paragraphs 1-38.

8

40.     The filing and prosecution of collection lawsuits notwithstanding a known defense, in the hope that the consumer will not raise the defense, is both a deceptive collection practice, in violation of 15 U.S.C. §§1692e, 1692e(2), 1692e(5), and 1692e(10), and an unfair collection practice, in violation of 15 U.S.C. §1692f.

41.     Since Kimber v. Federal Financial Corp., 668 F. Supp. 1480, 1488 (M.D.Ala. 1987), "bringing a lawsuit to which there appears to exist a complete defense" in the hope that the consumer will not realize it exists and will default or pay has been a violation of the FDCPA.

42.     In addition, by filing suit defendant misrepresents that it has proper title to the debt and the right to file suit, when this is not true.

43.     Section 1692e provides:

**§ 1692e.     False or misleading representations [Section 807 of P.L.]**

**A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .**

**(2)     The false representation of--**

**(A)     the character, amount, or legal status of any debt; . . .**

**(5)     The threat to take any action that cannot legally be taken or that is not intended to be taken. . . .**

**(10)     The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .**

44.     Section 1692f provides:

**§ 1692f.     Unfair practices [Section 808 of P.L.]**

**A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. . . .**

WHEREFORE, the Court should enter judgment in favor of plaintiff and the class and against defendant for:

(1)    Statutory damages;

(2)    Actual damages;

(3)    Attorney's fees, litigation expenses and costs of suit; and

(4)    Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS COLLECTION AGENCY ACT

45.    Plaintiff incorporates paragraphs 1-38.

46.    Defendant is a "collection agency" as defined in the ICAA.  Section 425/3(d), as amended effective Jan. 1, 2008, brings debt buyers within its purview by providing that "A person, association, partnership, corporation, or other legal entity acts as a collection agency when he or it . . . Buys accounts, bills or other indebtedness and engages in collecting the same."  Previously coverage was limited to a person who "Buys accounts, bills or other indebtedness with recourse and engages in collecting the same".  By deleting "with recourse," the legislature intended to classify as a "collection agency" persons such as the defendant who buy charged-off debts for their own account.

47.    Defendant violated 225 ILCS 425/8b by filing suit without an assignment in the form specified therein.

48.    Defendant negligently or knowingly violated the following provisions of 225 ILCS 425/9:

> . . .**(20) Attempting or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist.  . . .**

49.    A private right of action exists for violation of the ICAA.  Sherman v. Field Clinic, 74 Ill. App. 3d 21, 392 N.E.2d 154 (1st Dist. 1979).

50.    Plaintiff and the members of the class were damaged as a result.

WHEREFORE, plaintiff requests that the Court grant the following relief in favor of plaintiff and the class and against defendant:

a.    Compensatory, punitive and nominal damages, as appropriate;

b.    Costs; and

10

       c.     Such other and further relief as is appropriate.

## COUNT III – ILLINOIS CONSUMER FRAUD ACT

51.     Plaintiff incorporates paragraphs 1-38.

52.     Defendant's conduct as set forth above constitutes both unfair and deceptive acts and practices, in violation of §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2.

53.     Defendant engaged in such conduct in the course of trade and commerce.

54.     Defendant engaged in such conduct for the purpose of obtaining money from and injuring the credit of plaintiff and others.

55.     Plaintiff and the members of the class were damaged as a result.

56.     The filing of collection lawsuits is regularly picked up and reported by credit bureaus.

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of plaintiff and the class and against defendant for:

       a.     Actual damages;

       b.     Punitive damages;

       c.     An injunction against further violations;

       d.     Attorney's fees, litigation expenses and costs of suit; and

       e.     Such other or further relief as the Court deems proper.

                  s/Daniel A. Edelman
                  Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER
    & GOODWIN, L.L.C.
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiff demands trial by jury.

s/Daniel A. Edelman
Daniel A. Edelman

T:\21419\Pleading\Complaint_Pleading.wpd

12

**NOTICE OF LIEN**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
& GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KAREN CASTON-PALMER,                )
individually and on behalf of the   )
defined class,                      )
                                  )
           Plaintiff,       )    Judge Kennelly
                                  )
    -vs-                  )    Case No.:    08 C 2818
                                    )
NCO PORTFOLIO MANAGEMENT,           )    Magistrate Judge Valdez
INC.,                               )
                                  )
          Defendant.       )

## AFFIDAVIT OF ANTHONY ALBANESE

NOW COMES the affiant, Anthony Albanese, being first duly sworn upon oath under the penalty of perjury under the laws of the State of Arizona, and testifies that the following is true and correct to the best of my knowledge and belief.

1.    I am the Vice President of Purchase Portfolio for NCO Financial Systems, Inc.

2.    As a part of its business operations, NCO Portfolio Management, Inc. purchases account portfolios from creditors such as Citibank (South Dakota) National Association (Citibank).

3.    In the regular course of its business, NCO Portfolio Management, Inc. is a debt purchaser. NCO Portfolio Management, Inc. is a passive debt buyer that does not engage in debt collection. When NCO Portfolio Management, Inc. purchases a portfolio containing the account of an Illinois debtor, such as Plaintiff, NCO Portfolio

EXHIBIT

B

Management, Inc. will refer the debt to either a licensed collection agency or collection attorney in Illinois to perform collection activities. NCO Portfolio Management, Inc. (NCO) is not actively involved in debt collection.

4.    On or about September 30, 2004, NCO purchased an account portfolio containing 133,456 accounts from Citibank pursuant to the Purchase and Sale Agreement attached hereto as Exhibit 1.

5.    The Purchase and Sale Agreement between NCO and Citibank was in writing, contained an effective date of the assignment of rights, title and interest from Citibank to NCO and the consideration for the agreement. *See Exhibit 1.*

6.    Included in the 133,456 accounts purchased from Citibank was the account of Plaintiff Karen Caston, Account Number ▊▊▊▊▊▊▊▊8728.

7.    The 133,456 accounts purchased by NCO pursuant to the Purchase Agreement identified in paragraph 4 above were transmitted by Citibank to NCO in an electronic format.

8.    Attached hereto as Exhibit "2" is a summary of the account record for Karen Caston contained in the electronic file transmitted by Citibank pursuant to the Purchase Agreement identified in paragraph 4 above.

9.    NCO purchased, and Citibank assigned to NCO, all of the actionable rights held by Citibank in relation to the collection of the outstanding debt contained in the portfolio, which included the debt of Karen Caston for good and valuable consideration.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
Anthony Albanese

STATE OF *ARIZONA*           )
                             )  ss.
COUNTY OF *MARICOPA*         )

I certify that I know or have satisfactory evidence that Anthony Albanese is the individual who personally appeared before me, and said individual acknowledged that he signed this instrument as his free and voluntary act for the uses and purposes mentioned in the instrument.

Dated: *8/11/08*

*Catherine A. Ianone*

Print Name: *CATHERINE A. IANNONE*

NOTARY PUBLIC

**CATHERINE A. IANNONE**
Notary Public - Arizona
Maricopa County
Expires 04/30/10

- 3 -

**NCOP CAPITAL, INC.**
**PURCHASE AND SALE AGREEMENT**

**September 2004 Bankcard Accounts/Associates Lot #7**

This Purchase and Sale Agreement (the "Agreement") is made as of September 30, 2004, between Citibank (South Dakota), National Association (the "Bank"), a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, South Dakota 57117 and NCOP Capital, Inc. ("Buyer"), organized under the laws of the State of Nevada, with its headquarters/principal place of business at 3763 Howard Hughes Parkway, Suite 170, Las Vegas, NV 89109.

WHEREAS, the Bank desires to sell and Buyer desires to purchase certain of the Bank's credit card accounts on the terms and conditions hereinafter provided;

NOW, THEREFORE, in consideration of the mutual promises herein, Buyer and Bank agree as follows:

1.    DEFINITIONS

1.1    "Account Document" means, with respect to any account, any application, agreement, billing statement, notice, correspondence or other information in the Bank's possession that relates to an Account. An Account Document may include, without limitation, original documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process. Excluded from the definition of Account Document is any correspondence, report, information, internal analyses, sensitive attorney-client privileged documents, internal memoranda, documents, credit information, regulatory reports, and/or internal assessments of valuation of such Account, or any other documents relating to an Account that may be, but are not necessarily, missing or excluded (whether intentionally or unintentionally).

1.2    "Accounts" means the Bank's Visa and MasterCard accounts and receivables listed on the Asset Schedule (attached hereto as Exhibit 1) the balances of which the Bank has written off for accounting purposes, subject to adjustment of the Cut-Off Date (as defined below) in accordance with Section 2.2.

1.3    "Cardholder" means the person in whose name an Account was established.

1.4    "Closing Date" means September 30, 2004, or such other later date mutually agreed to by Buyer and the Bank.

1.5    "Cut-Off Date" means September 28, 2004.

1.6    "Purchase Price" means ████████████████████████████ ██████████████ ████████subject to Pre-Closing Adjustment pursuant to Section 2.2.

ncopcapcbsd#2-0904.doc

1

**EXHIBIT**

___1___

NCO 00012

1.7    "Adjustment Amount" means the portion of the Purchase Price allocated to the balance of any Account that is: (a) increased or decreased as described in Section 2.2(a); (b) retained by Bank and not transferred to Buyer pursuant to Section 2.2(b); or (c) repurchased by Bank pursuant to Sections 3.4 or 8.1. The Adjustment Amount shall be equal to the portion of the Purchase Price (prior to adjustment) attributable to the balance of the Account. This amount shall be determined by multiplying the balance by the percentage of the Purchase Price relative to the aggregate balance of Accounts associated with the unadjusted Purchase Price.

2.    PURCHASE AND SALE OF ACCOUNTS

2.1    Purchase and Sale. On the basis of, and subject to, the representations, warranties and covenants in this Agreement, the Bank agrees to sell, assign and transfer to Buyer, and Buyer agrees to purchase from the Bank on the Closing Date all right, title and interest of Bank in the Accounts. Buyer has made an independent investigation as it deems necessary as to the nature, validity, collectibility, enforceability and value of the Accounts, and as to all other facts that Buyer deems material to Buyer's purchase. Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment. Buyer has made an independent determination that the Purchase Price represents the Accounts' fair and reasonable value. The sale and assignment are without recourse to the Bank, and without warranty of any kind (including, without limitation, warranties pertaining to validity, collectibility, accuracy or sufficiency of information), except as stated in Article 3 below. Buyer acknowledges and understands that Bank has not provided the date of first delinquency of the Accounts for FCRA reporting purposes, and that it is Buyer's responsibility to obtain that information from credit reporting agencies or other sources. Buyer also understands that the account balances purchased include finance charges assessed up to the date the account was charged off by Bank. Buyer is not acting in reliance on any representation by the Bank, except as set forth in Article 3 below.

2.2    Pre-Closing Adjustment. The Purchase Price amount stated in Section 1.6 shall be adjusted to reflect any changes in the status of the Accounts as of the Cut-Off Date, as follows:

        (a)    a change in the balance of any Account from the balance shown on the due diligence tape provided to Buyer; and

        (b)    retention by the Bank of any Account that on the Cut-Off Date (i) to the Bank's knowledge, fail to meet the representations set forth in Section 3.4; or (ii) the Bank determines that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to an Account or a Cardholder, and naming the Bank or otherwise involving the Bank's interest therein in a manner unacceptable to the Bank, or the Bank otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that the Bank's interest therein cannot be adequately protected without the Bank owning such Account.

The Purchase Price will be adjusted by the Adjustment Amount associated with any balance or Account described above. The Bank will notify the Buyer of the adjusted Purchase Price prior to the Closing Date.

2

NCO 00013

2.3     Payment.  Buyer shall pay the balance of the Purchase Price on or before 12:00 p.m. (noon) Central Time on the Closing Date. Buyer shall withhold from the amount paid hereunder 3% of the Purchase Price ("Withheld Amount") subject to the provisions of Section 3.4(c) below. The Bank will transfer the Accounts to Buyer in accordance with Section 2.4 below.

2.4     Transfer.  On the Closing Date, subject to satisfaction or waiver of the conditions precedent set forth in Article 5 of this Agreement, the Bank and Buyer will execute and deliver to each other a Bill of Sale, Assignment and Assumption Agreement substantially in the form of Exhibit 2, and other mutually agreed upon Closing documents.  The Bank will provide to Buyer, on the closing date or at such other time as is mutually agreed to by the Buyer and Bank, a computer printout or magnetic tape listing the Accounts as of the Cut-Off Date that were purchased by the Buyer.  On the closing Date, Bank will transfer all Bank's right, title and interest in the Accounts and Buyer will assume, with respect to each Account, all of Bank's rights, responsibilities, and obligations that arise as a result of Buyer's purchase of the Accounts. If the Bank receives any payments of principal and/or interest by or on behalf of any Cardholder with respect to an Account between the Cut-off Date and the Closing Date, Bank shall hold such amounts in trust for Buyer and pay over such amounts to Buyer (without interest thereon) within forty-five (45) days after the Closing Date. If payments are received by the Bank from a Cardholder on or after closing date, the Bank shall forward such payments (without interest thereon) to Buyer within forty-five (45) days from date of receipt.  Bank shall charge Buyer the lesser fee of fifteen percent (15%) of the payment amount, or fifteen dollars ($15.00), to process any Account payment received by Bank more than one (1) year after the Closing Date.  Bank may, at its discretion, deduct the processing fee when remitting the payments to Buyer.

2.5     Sales, Use or Transfer Taxes.  If any sales, use or transfer tax is assessed or otherwise payable as a result of the transactions contemplated hereby, Buyer and Seller shall assume the obligation to pay such tax that is its responsibility to pay, to the extent such taxes relate to, or accrue on or after the Closing Date.

3.      REPRESENTATIONS AND WARRANTIES OF THE BANK

The Bank makes the following representations and warranties:

3.1     Due Organization; Authorization.  The Bank is duly organized, existing and in good standing as a national banking association, and the Bank's execution, delivery, and performance of this Agreement are within the Bank's corporate powers and have been duly authorized by all necessary corporate action.

3.2     Servicing.  After the Cut-Off Date, the Bank shall not compromise, settle (for less than full value) or otherwise release a Cardholder on any Account without Buyer's consent. The Bank will undertake only those servicing activities necessary to preserve and maintain the integrity and enforceability of the Accounts.

NCO 00014

3.3    Closing File. Bank represents that to the best of its knowledge and belief, and subject to the Pre-Closing Adjustments set forth in Section 2.2 above, there is not a material difference between the sale balances of accounts included in the due diligence tape made available to Buyer and the final sale balances lot of Accounts listed in Exhibit 1 purchased by Buyer.

3.4    Representations Concerning Accounts.    With respect to each Account, the Bank represents that to the best of its knowledge as of the Closing Date:

(a)    the debt represented by such Account has not been satisfied and/or the stated balance on such Account has not been paid;

(b)    each Account is a legal, valid and binding obligation of the Cardholder;

(c)    no final judgment has been entered by a court of competent jurisdiction with respect to the debt represented by the Account;

(d)    the Cardholder has not been released from liability on the Account;

(e)    the Account is not involved in an open bankruptcy case and has not been discharged in bankruptcy;

(f)    the Cardholder is not deceased;

(g)    the Bank has good and marketable title to the Account, is the sole owner thereof and has full right to transfer and sell the Account free and clear of any encumbrance, equity, lien, pledge, charge, claim, security interest, obligation to third party collection agencies or attorneys previously retained by the Bank;

(h)    there is no dispute, claim, action, suit or proceeding pending or threatened with respect to any Account;

(i)    the current balance on the Account is $100 or more;

(j)    each Account is closed and there is no requirement for future advances of credit or other performance by Bank; and

(k)    each Account has been maintained and serviced by Bank in full compliance with applicable state and federal laws including where applicable, without limitation, the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Fair Credit Billing Act.

(l)    no blanket, undifferentiated offer (excluding offers that may have been made to Cardholders on a "one-off" basis) has been made to the Cardholders generally or broadly defined class of Cardholders (including any class defined by length of delinquency) which offer is either currently effective or was made within the ninety (90) day period

NCO 00015

immediately preceding the designation of any such Account Balance as a Charged-off Account Balance (including the period of time between such designation and the Closing Date) and pursuant to which such Cardholders had or have the right to compromise, reduce or otherwise adversely effect their respective Account Balances; and,

(m)    a maximum of two percent (2%) of the Accounts may lack a Social Security number that can be validated through a major credit bureau service. The Buyer acknowledges and agrees that the Bank's failure to meet this representation shall not be considered a material breach of the Agreement, and Buyer's sole and only remedy for any breach of this Section 3.3 (m) shall be to require the Bank to repurchase any and all Accounts falling outside of the accuracy requirement as allowed under the procedure set forth in Section 5.5; and,

(n)    to the best of Bank's knowledge, no Cardholder plans to file for bankruptcy protection with respect to any Account.

The Bank makes no other representations or warranties, express or implied, with respect to any of the Accounts other than as specifically set forth in this Section 3.3.

3.4    Remedies for Breach of Representations Concerning Accounts.

(a) Time Period. Buyer's sole remedy against Bank for a breach of any of the representations listed in Section 3.3 shall be to notify the Bank of the breach no later than 180 days from the Closing Date. Bank shall then have, at its option, the right to (A) cure such breach referred to in the notice of Claim, in all material respects, (B) reimburse to Buyer an amount (the "Purchase Price Adjustment") equal to the reduction in value of the affected Accounts based upon the breach, or (C) repurchase the affected Accounts by paying Buyer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. A Notice of Claim under this Section 3.4 must be delivered by the Buyer to the Bank in writing and accompanied by the documentation required under Section 3.4(b). Notwithstanding Section 12.10, the Buyer's failure to provide a Notice of Claim with respect to any claimed breach of Bank as provided in this Section 3.4 shall terminate and waive any rights Buyer may have to any remedy for such breach under Section 3.3 of this Agreement.

(b) Form of Notice Required. Buyer shall notify Bank in writing of each Account of which Buyer seeks to have Bank repurchase. All notices shall contain the customer's name and Bank's account number and will be accompanied with the following applicable documentary evidence satisfactory to the Bank:

Bankruptcies:    Credit Bureau with non-dismissed bankruptcies, or
                 Attorney name, case number, and date of filing, or
                 Copy of actual court papers, or approved third party service
                 (Banko, Inc.; Experian; Trans Union; or Equifax)

Deceased:        Copy of death certificate, or
                 Credit bureau indicating date of death, or

NCO 000016

|  | Executor or attorney letter with date of death, or approved third party service (Banko, Inc.; Experian; Trans Union; or Equifax) |
|---|---|
| Settled or Paid in Full: | Copy of Bank or bank agent letter verifying action Copy of the canceled, final check (front and back) |
| Fraud: | Letter from or to Citibank or Citibank agent Complaint in writing explaining event |

Bank shall make a determination within forty five (45) business days after receipt of Buyer's Request, unless Bank's delay in responding is caused by or related to Buyer's failure to provide Bank with necessary information and documentation required under this Section 3.4.

(c) <u>Repurchase Price</u>. If the Bank elects to either repurchase the Accounts or reimburse the Buyer in the amount of the Purchase Price Adjustment, the Bank shall not be obligated to make payment on an Account by Account basis, but may elect to provide such adjustment in a single amount as an offset against the Withheld Amount within 30 days of notification, at Bank's option. Should the amount of the Repurchase Price exceed the Withheld Amount, the Bank shall make payment of the excess amount with the 30 day period set forth in this Section. If, at the end of the 180 day period set forth in Section 3.4(a) above, the Withheld Amount exceeds the amount of the Repurchase Price, Buyer shall, within 14 days, pay such excess to Bank. The Bank makes no representation as to the number of Accounts that may be subject to repurchase pursuant to this section.

## 4.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer makes the following representations and warranties:

4.1    <u>Due Organization; Authorization</u>. Buyer is duly organized, existing and in good standing as a corporation under the laws of the State of Nevada. Buyer has full authority to execute, deliver and perform this Agreement according to its terms, and Buyer's execution, delivery and performance of this Agreement have been duly authorized, and are not in conflict with any law or regulation applicable to Buyer or the terms of Buyer's partnership documents or articles of incorporation, charter or bylaws, as applicable, or of any indenture, agreement or undertaking to which Buyer is a party or by which it or any of its assets is bound.

4.2    <u>No Conflict</u>. Buyer's review of Account and Cardholder information will not represent a conflict of interest on the part of Buyer or Buyer's officers or employees, and that neither Buyer nor any of Buyer's affiliated companies is presently a party to any litigation, or involved in any litigation, with any Cardholder or with the Bank.

The execution and delivery of this Agreement by Buyer and the performance of its obligations hereunder will not (i) conflict with or violate (A) the organizational documents of Buyer, or (B)

NCO 00017

any provision of any law or regulation to which Buyer is subject, or (ii) conflict with or result in a breach of or constitute a default (or any even which, with notice or lapse of time, or both, would constitute a default) under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it is bound or any order or decree applicable to Buyer or result in the creation or imposition of any lien on any of its assets or property. Buyer has obtained all consents, approvals, authorizations or orders of any court or governmental agency or body, if any, required for the execution, delivery and performance by Buyer of this Agreement.

4.3   Investigation of Accounts. Buyer is a sophisticated investor and its bid and decision to purchase the Accounts are based upon its own independent expert evaluations of the nature, validity, collectibility, enforceability and value of the Accounts. The Buyer has had sufficient opportunity to complete the independent investigation and examination into the Accounts that Buyer deems necessary. Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment. Buyer has made an independent determination that the Purchase Price represents the Accounts' fair and reasonable value. Buyer is not acting in reliance on any representation by the Bank, except those listed in Section 3.3.

4.4   Accounts Sold As Is. Buyer acknowledges and agrees that except for warranties and representations set forth in Section 3.3 of this Agreement, Bank has not and does not represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of any of the Accounts and supporting documentation provided by Bank to Buyer, and, subject to the terms of this Agreement, all documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to Buyer with respect to any and all Accounts is sold, transferred, assigned and conveyed to Buyer on an "AS IS, WHERE IS" basis, WITH ALL FAULTS.

4.5   No Finders. Buyer has not utilized any investment banker or finder in connection with the transaction contemplated hereby who might be entitled to a fee or commission upon consummation of the transactions contemplated in this Agreement.

5.   CONDITIONS PRECEDENT TO PURCHASE AND SALE OF ACCOUNTS

5.1   Representations and Warranties. The representations and warranties of the Bank and Buyer in this Agreement will be true and correct as of the Closing Date.

5.2   Compliance with Covenants and Agreements. Buyer and the Bank will have complied in all material respects with each of their respective covenants and agreements in this Agreement on or before the Closing Date.

5.3   No Violation of Law. Consummation by Buyer and the Bank of the transactions contemplated by this Agreement and performance of this Agreement will not violate any order of any court or governmental body having competent jurisdiction or any law or regulation that applies to Buyer or the Bank.

NCO 00018

5.4    <u>Reassignment and Removal from Trusts</u>. As of the Closing Date (i) any outstanding Account receivables owned as of the Closing Date by Bank are not securitized or will have been reassigned to the Bank, and (ii) all conditions precedent for removal of such receivables from Standard Credit Card Master Trust will have been satisfied. In the event that this condition cannot be satisfied prior to the Closing Date, this Agreement shall terminate, Buyer's deposit shall be returned to Buyer and the Bank shall have no further obligation to Buyer hereunder.

5.5    <u>Approvals and Notices</u>. All required approvals, consents and other actions by, and notices to and filings with, any governmental authority or any other person or entity will have been obtained or made. If Buyer is a corporation, Buyer will have delivered to the Bank a certificate from Buyer's corporate secretary (or other documentation satisfactory to the Bank and its counsel) certifying that Buyer's board of directors has resolved or consented to Buyer entering into this Agreement and consummating the transactions contemplated hereby.

5.6    <u>UCC Financing Statements</u>. Buyer will prepare on or after the Closing Date, as the parties hereto shall agree, such UCC Financing Statements for filing in such jurisdictions as the Buyer may deem necessary or appropriate. The UCC Financing Statements shall be for notice purposes only and shall expressly indicate that UCC Financing Statements are for notice purposes only and creates no security interest in the assets, property or interests of the Bank.

6.    RIGHTS AND OBLIGATIONS OF THE BANK AND BUYER AFTER THE CLOSING DATE

6.1    <u>Notice to Cardholders</u>. After the Closing Date, the Bank may, but will not be obligated to, give any Cardholder written or oral notice of the transfer of the Cardholder's Account to Buyer at the Cardholder's last known address. At Buyer's reasonable request, the Bank will provide a form letter that Buyer may send to a Cardholder to confirm that the Bank sold the Cardholder's Account to Buyer. The Bank shall have the right to review and approve, which approval will not be unreasonably withheld, all written notices sent by the Buyer to the Cardholder informing the Cardholder of the transfer of the Cardholder's Account to the Buyer. The Buyer shall not discredit or impugn the reputation of the Bank in any correspondence sent to the Cardholder in connection with the Accounts purchased by the Buyer.

6.2    <u>Retrieval of Account Documents</u>. After the Closing Date, the Bank will furnish Buyer at no charge with Account Documents that Buyer reasonably requests within 365 days of the Closing Date, up to a maximum number of Account Documents equal to 10% of the Accounts purchased. The Bank will charge $5.00 for each Account Document furnished on Accounts in excess of the 10% threshold, or requested after 365 days of the Closing Date, but prior to three years after the Closing Date. Except in instances of litigation unrelated to collection activity or accounts that are within the statute of limitation at the time requested, the Bank will have no obligation to provide Buyer with Account Documents after three years after the Closing Date. Documents will be furnished within 45 days of the date of the request. Buyer's request for an Account Document must be presented to Bank on a form provided by Bank and must be made

NCO 00019

with sufficient specificity to enable the Bank to locate the Account Document. The Bank will use reasonable diligence to provide the Account Document. The failure of the Bank to provide an Account Document requested by Buyer will not be a breach of this Agreement. If the Bank cannot reasonably provide an Account Document that the Buyer requests, the Bank will inform Buyer accordingly, and at Buyer's request, provide an Affidavit in the form shown in Exhibit 3, as a substitute Account Document in accordance with the terms of this paragraph, provided that the parties will mutually agree to a timeframe within which affidavits given in lieu of Documents will be produced.

Buyer may, in addition to its request for Account Documents, request an Affidavit from Bank, in the form shown in Exhibit 3, indicating the date the Account was opened, the Account number and the balance existing as of a specified date. The Bank will provide a total number of affidavits equal to one percent (1%) of the total accounts purchased. The Buyer shall be limited to one request for affidavits per week with a maximum of 100 accounts per request. Bank shall have three (3) weeks to complete the affidavits requested. Requests shall contain sufficient information about the relevant accounts to allow Citibank representatives to locate the Account information to complete the affidavits. The Buyer shall pay Bank $10.00 per affidavit requested and provided. Payment shall be due at the time the affidavit is provided.

6.3    Credit Bureau Reporting. The Bank shall promptly request that the major credit reporting agencies (including, without limitation, Experian, CBI and Trans Union) delete the Accounts from their records. The Buyer may report its ownership of the Accounts to credit reporting agencies provided that the Buyer agrees to comply with the Fair Credit Reporting Act (FCRA) and any other laws or regulations governing credit agency reporting.

6.4    Compliance with Law. With respect to any Account, Buyer or Buyer's agent will at all times: (a) comply with all state and federal laws applicable to debt collection, including, without limitation, the Consumer Credit Protection Act, the Fair Credit Reporting Act and the Fair Debt Collection Practices Act, and (b) for any Account where the statute of limitations has run, not falsely represent that a lawsuit will be filed if the Cardholder does not pay.

6.5    Post Closing Account Review. Prior to initiating any contact, whether verbal, written or electronic, with the Cardholder, Buyer shall review the portfolio through a competent third party vendor (e.g., Banko, Inc.) or other process to discover whether any Accounts included are involved in an open bankruptcy case or have not been discharged in bankruptcy (the "Post Sale Scrub") or if available from the third party vendor have indicators, notes or flags that demonstrate that the Cardholder claims to be a victim of identity theft. The Buyer shall immediately notify Bank of any Accounts that have flags or indicators of identity theft and Buyer shall sell the Accounts back to Bank prior to Buyer contacting Cardholders. Furthermore, Buyer shall immediately cease any collection efforts upon receiving notice (whether from the Cardholder, the Seller, or a third party on behalf of the Cardholder) that a Cardholder has discharged the debt in bankruptcy, and shall not re-commence collection activity until Buyer has conducted a reasonable investigation into the Cardholder's claim and determined, based upon reasonable evidence, that the Cardholder's claim is unfounded.

NCO 00020

6.6    Notice of Claims.  Buyer will notify the Bank immediately of any claim or threatened claim against the Bank, or any claim or threatened claim that may affect the Bank, that is discovered by Buyer.  The Bank will use its reasonable efforts to promptly notify the Buyer of any notice it receives that an account is subject to Bankruptcy protection.

6.7    Seller As Witness.  If Buyer, upon reasonable written notice to Seller, requests or subpoenas an officer or employee of Seller to appear at a trial, hearing or deposition concerning an Account to testify about the Account, Seller shall ensure the requested employee appears at such hearing or deposition and will be available for consultation with Buyer.  Buyer will pay Seller for the officer's or employee's time in traveling to, attending and testifying at the trial, hearing or deposition, whether or not the officer or employee is called as a witness, at the hourly rate equivalent of such officer or employee.  Buyer will also reimburse Seller for the officer's or employee's reasonable out-of-pocket, travel-related expenses.

7.    USE OF BANK'S NAME

7.1    Use of Names.  The Buyer will not use or refer to the name "Citibank," "Citibank Classic," "Citicorp," "Citigroup", "Associates Capital Bank, Inc.", "Associates Credit Card Services, Inc.", "Associates Commerce Solutions", "Associates National Bank", "Universal Card Services Corp." or any similar name or successor corporation, except to reference "Citibank" for purposes of identifying an Account in communications with the Account's Cardholder, in collecting amounts outstanding on the Account, and in conducting litigation or participating in a bankruptcy proceeding with respect to the Account.  Buyer shall not represent that there is an affiliation or agency relationship between Buyer and the Bank, nor shall Buyer state or represent in any way that it is acting for or on behalf of the Bank.  Buyer shall not misrepresent, mislead or otherwise fail adequately to disclose its ownership of the Accounts.

7.2    Breach.  Buyer and the Bank acknowledge that Buyer's breach of this Article 7 will result in actual and substantial damages to the Bank, the amount of which will be difficult to ascertain with precision.  Therefore, if Buyer breaches this Article 7, Buyer will pay the Bank the sum of $10,000.00 for each breach (each breach being the single use of the above names, communicated to a third party as described above) as liquidated damages and in preventing Buyer's further breach of this provision.

8.    THE BANK'S RIGHT TO REPURCHASE ACCOUNTS

8.1    Accounts Affected.  The Bank shall have the right to repurchase any Account that has not been paid in full, released or compromised by Buyer, if the Bank determines that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to an Account or a Cardholder, and naming the Bank or otherwise involving the Bank's interest therein in a manner unacceptable to the Bank, or the Bank otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that the Bank's interest therein cannot be adequately protected without the Bank owning such Account.

NCO 00021

8.2    <u>Right to Repurchase.</u>

(a)    Upon notice to Buyer, the Bank may repurchase any Account described in Section 8.1 by repaying to Buyer the Adjustment Amount associated with the repurchased Account.

(b)    Upon delivering to the Bank a full accounting of the Account, Buyer may retain any money or value that Buyer collected or received on the Account before Buyer's receipt of the Bank's notice electing to repurchase the Account; provided that, after Buyer has received the Bank's notice, Buyer will immediately cease releasing or compromising the Account.

9.    RIGHT OF RESALE

9.1    <u>Sale or Transfer to a Third Party.</u>  Buyer may resell or transfer the ownership of any Account to a third party, including the transfer of Cardholder information (such as names and addresses) to any third party, (each referred to as "Third Party Buyer"); provided, however, that Buyer must conduct commercially reasonable and prudent due diligence of the Third Party Buyer.  Buyer shall defend, indemnify and hold harmless Bank from any and all causes of action, claims, expenses or judgments incurred by Bank for which Buyer's Third Party Buyer or any buyer of Third Party Buyer  (collectively referred to herein as "Downstream Buyer") is solely or partially responsible. Buyer shall require all Downstream Buyers to agree to be bound to all of the Buyer's obligations and limitations or remedies, and to acknowledge all of Bank's rights set forth in this Agreement including, without limitation, the Sections in Articles 6, 7, 8, and 9.  All Downstream Buyers' requests for documentation pursuant to Section 6.2 must be made to Bank through Buyer, unless Bank otherwise agrees in writing.  Nothing in this Section 9.1 shall modify the indemnification provisions between Bank and Buyer as set forth in Article 10 of this Agreement.

Furthermore, Buyer shall not resell, transfer, convey or assign the ownership of any Account to Providian Financial Corporation, First Select Corporation (a Providian Financial Company) or Capital One Financial Corporation, for a period of one (1) year from the Closing Date.



9.2 ███████████████████████████████████████████████████ Buyer and Bank shall enter into an amendment to this Agreement that shall set forth in detail all the Accounts sold ████████  Bank agrees, within thirty (30) days after the effective date of the forgoing amendment, that Bank shall promptly update its internal systems to identify Accounts purchased from Buyer ████████ and hereby agrees pursuant to Section 9.1 above to thereafter interact directly ████████ with respect to (i) all requests for documentation pursuant to Section 6.2; and (ii) transfer of post-closing date payments received by Bank pursuant to Section 2.4 less any applicable fees. Except as specifically set forth in this paragraph, ██████ shall be a Downstream Buyer as defined in this Agreement and Buyer shall continue to be obligated by all terms and conditions as set forth in this Agreement.

9.3    Exceptions. Section 9.1 shall not apply to Buyer's sale, pledge or transfer of Accounts to one or more of its wholly owned subsidiaries or affiliates or to a trust or other special purpose vehicle which is wholly owned by such subsidiary for the sole purpose of obtaining financing and/or issuing asset-backed securities secured by such Accounts, provided that Buyer shall give Bank prior notice of the sale, pledge, or transfer under this Section 9.3.

9.4    Pledge and Assignment of Assets. Notwithstanding any other provision of this agreement, the Seller hereby consents to the Buyer's pledge and assignment of its rights, title and interests in and to the Assets and in and to this Agreement to any lender providing financing for the Buyer's acquisition of the Assets, and agrees that no restrictions or conditions imposed by the Seller pursuant to this Agreement on assignments of the Assets or of Buyer's right in this Agreement shall apply to such lender's rights as a secured party or an assignee.

10.    INDEMNIFICATION

10.1    Indemnification by Buyer. Buyer hereby agrees to indemnify, defend, and hold harmless the Bank, its parents, subsidiaries and affiliates, and their officers, directors and employees from and against any and all claims, damages, losses, costs or expenses (including any and all reasonable attorneys' and experts' fees), asserted by a third party that Bank might suffer, incur or be subjected to by reason of any legal action, proceeding, arbitration or other claim, whether commenced or threatened, whether or not well grounded and by whomsoever concerned, based upon any breach of this Agreement, or any other act or omission by Buyer, its officers, directors, agents, employees, representatives or any Downstream Buyers with respect to any Account or any party obligated on an Account after the Closing Date; provided, however, that, (i) the Bank notifies Buyer within a reasonable time of any such claim or action, (ii) such claims, damages, losses, costs or expenses are not solely attributable to any negligent act or omission by the Bank, its parent, affiliates, subsidiaries or any of their employees or agents and (iii) the Bank provides Buyer with information that is available to the Bank and is reasonably necessary for Buyer to prosecute its defense of the action.

Buyer shall bear all expenses in connection with the defense and/or settlement of any such claim or suit. The Bank shall have the right, at its own expense, to participate in the defense of any claim against which it is indemnified and which has been assumed by the obligation or indemnity hereunder; Buyer, in the defense of any such claim, except with the written consent of the Bank, shall not consent to entry of any judgment or enter into any settlement that either: (a) does not include, as an unconditional term, the grant by the claimant to the Bank of a release of all liabilities in respect of such claims, or (b) otherwise adversely affects the rights of the Bank.

10.2    Indemnification by Bank. Bank hereby agrees to indemnify, defend, and hold harmless the Buyer, its parents, subsidiaries and affiliates, and their officers, directors and employees from and against any and all claims, damages, losses costs or expenses (including any and all reasonable attorneys' and experts' fees) asserted by a third party that Buyer might suffer, incur or be subjected to by reason of any legal action, proceeding, arbitration or other claim, whether commenced or threatened, whether or not well grounded and by whomsoever concerned, based

NCO 00023

upon any breach of this Agreement, or any other act or omission by Bank, its officers, directors, agents, employees, or representatives with respect to any Account or any party obligated on an Account prior to the Closing Date, provided, however, that (i) the Buyer notifies Bank within a reasonable time of any such claim or action, (ii) such claims, damages, losses, costs or expenses are not solely attributable to any negligent act or omission by the Buyer, its parent, affiliates, subsidiaries, transferees, contractors, agents or any of their employees or agent and (iii) the Buyer provides Bank with information that is available to the Buyer and is reasonably necessary for Bank to prosecute its defense of the action.

Bank shall bear all expenses in connection with the defense and/or settlement of any such claim or suit. The Buyer shall have the right, at its own expense, to participate in the defense of any claim against which it is indemnified and the defense of which has been assumed by the Bank's obligation or indemnity hereunder. Bank, in the defense of any such claim, except with the written consent of the Buyer, shall not consent to entry of any judgment or enter into any settlement that either, (a) does not include, as an unconditional term, the grant by the claimant to the Buyer of a release of all liabilities in respect of such claims, or (b) otherwise adversely affects the rights of the Buyer.

10.3    Survival. The provisions of this Article 10 shall survive the termination or expiration of this Agreement.


11.    CONFIDENTIALITY

11.1    Confidential Information. From and after the execution of this Agreement, Buyer hereto shall keep confidential, and shall use reasonable efforts to cause their respective officers, directors, employees and agents to keep confidential, any and all information obtained from the Bank concerning the assets, properties and business of the Bank, and shall not use such confidential information for any purpose other than those contemplated by this Agreement; *provided, however*, that Buyer shall not be subject to the obligations set forth in the preceding sentence with respect to any such information provided to it by the Bank which either (i) was in Buyer's possession at the time of the Bank's disclosure, (ii) was in the public domain at the time of the Bank's disclosure, or subsequently enters the public domain through no act or failure to act on the part of the Bank, or (iii) is lawfully obtained by Buyer from a third party. Nothing in this Agreement shall be construed to limit Buyer's obligations under the confidentiality agreement entered into between Buyer and the Bank.

11.2    Public Announcement. Neither Buyer nor the Bank shall make any public announcement of this Agreement or provide any information concerning this Agreement or the subject matter hereof to any representative of the news media without the prior approval of the other party. The parties will not respond to any inquiry from public, governmental, or administrative authorities concerning this Agreement without prior consultation and coordination with each other.

11.3    Survival. The provisions of this Article 11 shall survive the termination of this Agreement.

NCO 00024

12.    GENERAL PROVISIONS

12.1    Applicable Law.  The laws of the State of South Dakota shall govern the enforcement and interpretation of this Agreement and the rights, duties and obligations of the parties hereto.

12.2    WAIVER OF JURY TRIAL.  NOTWITHSTANDING ANYTHING STATED HEREIN, IF EITHER PARTY BRINGS ANY ACTION AGAINST THE OTHER PARTY, WHETHER AT LAW OR EQUITY, REGARDING THE OTHER PARTY'S PERFORMANCE UNDER THIS AGREEMENT OR BRINGS ANY ACTION CONNECTED IN ANY WAY WITH THIS AGREEMENT, THE PARTIES AGREE TO WAIVE TRIAL BY JURY.

12.3    Notices.  All notices or other documents required to be given pursuant to this Agreement shall be effective when received and shall be sufficient if given in writing, hand delivered, sent by overnight air courier or certified United States mail, return receipt requested, addressed as follows:

|  |  |
|---|---|
| If to Bank: | Citibank (South Dakota), National Association<br>Attn:  General Counsel<br>701 East 60th Street North<br>Sioux Falls, SD  57117 |
| And Copies to: | Citicorp Credit Services, Inc. (USA)<br>Attn:  Rob Strub<br>7920 NW 110th Street<br>Kansas City, MO  64153 |
| If to Buyer: | NCOP Capital, Inc.<br>Attn:  Michael Meringolo<br>507 Prudential Road<br>Horsham, PA  19044 |
| And Copies to: | NCOP Capital, Inc.<br>Joshua Gindin, Esq.<br>507 Prudential Road<br>Horsham, PA  19044 |

The parties hereto may at any time change the name and addresses of persons to whom must be sent all notices or other documents required to be given under this Agreement by giving written notice to the other party.

12.4    Binding Nature of Agreement.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto, and their respective legal representatives, successors and permitted assigns.

NCO 00025

12.5    Assignment.   Neither party may assign this Agreement or any of its rights in this Agreement without the other's prior written consent, except as provided in Article 9 above. Notwithstanding the foregoing sentence, Bank may assign its rights and obligations under this Agreement to any of its affiliates, subsidiaries, or parent corporations without obtaining Buyer's permission or consent.

12.6    Expenses.   Except as otherwise expressly provided in this Agreement, Buyer and the Bank will each bear its own out-of-pocket expenses in connection with the transaction contemplated by this Agreement.

12.7    Entire Agreement.   This Agreement and the Exhibits hereto embody the entire agreement and understanding between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.   The parties make no representations or warranties to each other, except as contained in this Agreement or in the accompanying Exhibit or the certificates or other closing documents delivered in accordance with this Agreement.    All prior representations and statements made by any party or its representatives, whether orally or in writing, are deemed to have been merged into this Agreement, except as otherwise stated in this Agreement.

12.8    Amendment.   Neither this Agreement nor any of its provisions may be changed, waived, discharged or terminated orally.   Any change, waiver, discharge or termination may be effected only by a writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

12.9    Severability.   If any one or more of the provisions of this Agreement, for any reason, is held to be invalid, illegal or unenforceability, the invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement will be construed without the invalid, illegal or unenforceable provision.

12.10   Waiver.   Except as required under Section 3.4, no failure of any party to take any action or assert any right hereunder shall be deemed a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

12.11   Headings.   Headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement.

12.12   Counterparts.   This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.

NCO 00026

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date first written above.

Citibank (South Dakota),
National Association

By: _____
            (Signature)

Name: DAVID L. ZIMBECK
        Vice President & General Counsel
        Citibank (South Dakota), N.A.
        Sioux Falls, SD/1251
Title: _____605-331-1630_____

NCOP Capital, Inc.

By: _____
            (Signature)

Name: _____

Title: _____

NCO 00027

**EXHIBIT 1**
**ASSET SCHEDULE**

| LOT # | # OF ACCOUNTS | CURRENT BALANCE |
|-------|---------------|-----------------|
| #7    |               |                 |

NCO 00028

**EXHIBIT 2**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT is dated as of _____ between Citibank (South Dakota), National Association, a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, SD   57117 (the "Bank") and _____, a _____ corporation, located at _____ _____ ("Buyer").

For value received and subject to the terms and conditions of the Purchase and Sale Agreement dated _____, between Buyer and the Bank (the "Agreement"), the Bank does hereby transfer, sell, assign, convey, grant, bargain, set over and deliver to Buyer, and to Buyer's successors and assigns, the Accounts described in Section 1.2 of the Agreement.

This Bill of Sale, Assignment and Assumption Agreement is executed without recourse and without representations or warranties including, without limitation, warranties as to collectibility.

_____

By: _____          By: _____
       (Signature)                                   (Signature)

Name: _____      Name: _____

Title: _____        Title: _____

NCO 00029

**EXHIBIT 3**

**AFFIDAVIT**

State of _____

County of _____

Name:                                              Account No:
                                                   Social Security No:


_____, being sworn, deposes and says that the affiant making this affidavit is an employee of Citicorp Credit Services, Inc. (USA), (the "Company"), which is located at 7920 NW 110th Street, Kansas City, MO 64153. The affiant is authorized to make the statements and representations herein. The Company's business records show that as of _____, there was due and payable from Account # _____ the amount of $_____. The Company's business records show that this Account was opened or acquired on _____. The affiant states that to the best of affiant's knowledge, information and belief there are no uncredited payments against the said debt.

Dated this _____day of _____,_____

                              _____

                              The Company


                              By:_____
                              Printed Name: _____

Subscribed to and sworn to before me this _____day of _____, _____by
_____, _____of the Company.
                              (Title)


                              _____

                              Notary Public

NCO 00030

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT is dated as of September 30, 2004, between Citibank (South Dakota), National Association, a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, SD 57117 (the "Bank") and NCOP Capital, Inc., a Nevada corporation, located at Hughes Center, Suite 460, 3993 Howard Hughes Parkway, Las Vegas, NV 89109 ("Buyer").

For value received and subject to the terms and conditions of the Purchase and Sale Agreement dated September 30, 2004, between Buyer and the Bank (the "Agreement"), the Bank does hereby transfer, sell, assign, convey, grant, bargain, set over and deliver to Buyer, and to Buyer's successors and assigns, the Accounts described in Section 1.2 of the Agreement.

This Bill of Sale, Assignment and Assumption Agreement is executed without recourse and without representations or warranties including, without limitation, warranties as to collectibility.

Citibank (South Dakota),
National Association

By: _____
              (Signature)
              DAVID L. ZIMBECK
              Vice President & General Counsel
Name: _____Citibank (South Dakota), N.A._____
              Sioux Falls, SD/1251
              605-331-1630
Title: _____

NCOP Capital, Inc.

By: _____
              (Signature)

Name: ___Joshua Gindin___

Title: _____EVP_____

ncopcapcbsd#2-0904.doc



Citibank (South Dakota), N.A.

P.O. Box 6000
Sioux Falls, SD 57117-6000

## POWER OF ATTORNEY FOR COLLECTION ACCOUNTS

This Power of Attorney is being executed and delivered by the undersigned, Citibank (South Dakota), National Association, a national banking association ("Seller" or the "undersigned") at the closing of the transactions pursuant to that certain Purchase and Sale Agreement dated September 30, 2004, ("Agreement") between Seller and NCOP Capital, Inc. (referred to as "you" or "Purchaser"). Pursuant to the Agreement Seller will sell, transfer and assign to the Purchaser certain credit card accounts receivable, (collectively the "Accounts" and singularly an "Account").

In connection with the foregoing, and to facilitate the collection by Purchaser and its Agent of the Accounts, the undersigned hereby appoints you and NCO Financial Systems, Inc. as Attorney-in-Fact of and for the undersigned in accordance with the following provisions:

1.   **Power of Attorney.** The undersigned hereby appoints you and NCO Financial Systems, Inc. as Attorney-in-Fact of and for the undersigned, with full power of substitution, with all power and authority in the same of the undersigned:

   (a) To make, endorse, accept, receive, sign, seal, execute, acknowledge and deliver notes, assignments, agreements, certificates, hypothecations, checks, bonds, vouchers, receipts, and other written instruments of whatever kind and nature which evidence or are related to the Accounts and any property given in pledge or security therefore; and

   (b) To deposit and withdraw for your own use, in either the undersigned's name or your name, or jointly in both our names, any funds, monies or properties which may come into your hands and which are proceeds from, or other payment upon, any account purchased under the terms of the Purchase and Sale Agreement dated September 30, 2004, between the parties.

2.   **Governing Law.** This Power of Attorney shall be construed In accordance with the laws of the State of South Dakota applicable to agreements made and to be performed entirely within such State.

3.   **Authority.**   This instrument constitutes a representation of the authority of the undersigned to execute and deliver this Power of Attorney.

Citibank (South Dakota),
National Association

By: _____

Its: _____
DAVID L. ZIMBECK
Vice-President & General Counsel
Citibank (South Dakota), N.A.
Sioux Falls, SD/1251
605-331-1630

ncopcapcbsd#2-0904.doc

3358730

A member of citigroup

NCO 00032

Account Record For Karen Caston



```
ACT_NO                              8728
ACT_NO_NUM          00000000000000000
SSN
APR                      00000
BKRPT_IND
LST_STAT_UPD             20020710
PROD_CD                  783
DT_BE_MEMBR         20010517
LST_PMT_DT               20011207
LST_PMT_AMT         15
LST_PUR_DT               20011023
LST_CA_DT                19000000
NAME                     KAREN;CASTON
ADDRESS_1
ADDRESS_2
CITY
STATE
ZIP
DT_NA_CHG                0
HOME_PHONE          0000000
BUS_PHONE                00000000000000000
ORIGINAL_BALANCE         1009.82
CURRENT_BALANCE          1009.82
REFF_DT                  0
REFF_AMT                 0
WRITEOFF_DT         20020710
STATUTE_LMT
AGENCY_LVL
JOINT_IND
NAME_2
SSN_2                    000000000
SEGMENT
WOFF_INT                 0
WOFF_AMT                 1009.82
```

EXHIBIT
2