**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KAREN CASTON-PALMER,<br>also known as KAREN CASTON,<br>individually and on behalf of the class<br>defined herein, | )<br>)<br>)<br>) | |
| | ) | 1 : 08 CV 2818 |
| Plaintiff, | ) | Judge Kennelly |
| | ) | Magistrate Judge Valdez |
| vs. | ) | |
| | ) | |
| NCO PORTFOLIO MANAGEMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MOTION TO COMPEL PRODUCTION**

Plaintiff respectfully requests that this Court direct defendant to produce, forthwith, complete responses to discovery requests, as well as certain documents in its possession.

This motion is brought in accordance with Local Rule 37.2, after a good-faith attempt to resolve discovery disputes without Court intervention that included a teleconference between the parties' counsel, held on August 21, 2008.  (Exhibit A.)

In further support of this motion, plaintiff states as follows:

*Background*

1.      On June 25, 2008, plaintiff served a set of written discovery requests upon defendant.  A second set of discovery requests was served the next day, on June 26, 2008.

2.      After an extension of time in which to respond was provided, defendant served responses to both sets of discovery on August 8, 2008, as well as a set of documents.

3.      The written responses to the first set of discovery requests (together with the requests themselves) are attached hereto as Exhibit B.

4.      Several discovery disputes that plaintiff raised with defendant remain unresolved. Other disputes were tentatively resolved, subject to a series of accommodations that were

1

provided to defendant.  (Exhibit A.)[1]

*Searchability of records*

5.      Interrogatory 6 of plaintiff's first set of discovery requests asks defendant to state whether the data maintained about alleged debtors' accounts is searchable and retrievable. Defendant objected to this interrogatory, claiming that the information sought is confidential and proprietary, and because the interrogatory does not seek relevant information.  (Exhibit B at 7-8.)

6.      Defendant's objections are not well taken.  The information sought is properly discoverable, as it is relevant to the case and likely to lead to the production of other admissible information.  Fed.R.Civ.P. 26(b)(1).  Plaintiff seeks the information on searchability so that she can know whether defendant's records can be searched for the names of collection attorneys to which accounts have been referred, for charge-off dates on alleged debts, or for the names and addresses of members of both putative classes.  Thus, the information sought goes directly to the merits of the case and the propriety of class certification.

7.      Fed.R.Civ.P. 26(b)(2)(B) provides that a party "need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost."  What information is retrievable and searchable from defendant's computer system, as it is presently configured, goes directly to that issue.

8.      Furthermore, whether a database is searchable by certain fields does not in any way represent "a trade secret or other confidential research, development, or commercial information" that is properly protectable.  Fed.R.Civ.P. 26(c)(1)(G).  Searching a database under certain categories is an everyday business practice; the fact that NCO Portfolio Management is able to conduct such a search on various categories would surprise no one, or cause any sort of competitive disadvantage.

---

[1] Plaintiff reserves her right to seek enforcement of other discovery requests, made in both the first and second sets of requests, that remain unanswered notwithstanding these accommodations.

*Information relating to debt collection statutes*

9.      Defendant has failed to respond to Request for Production 3 of the first set of discovery requests.  This request for production seeks documents "which discuss, describe or set forth standards, criteria, guidelines, policies or practices relating to the Fair Debt Collection Practices Act [15 U.S.C. §1692 *et seq.* ("FDCPA")], the Illinois Collection Agency Act [225 ILCS 425/1 *et seq.* ("ICAA")], or other state statutes regulating debt collectors or debt collection."  Defendant objected, on the grounds of undue burden, privilege, confidentiality, vagueness and relevancy – and specifically stated that "none of the allegations in this case involve NCO's collection activities."  (Exhibit B at 12.)

10.      Defendant's refusal to produce information is based upon its unsupportable claim that it is not conducting collection activities.  This position is contrary to defendant's response to Request for Admission 4 of the first set of discovery requests:

> *4.*          In NCO's complaint in the matter entitled *NCO Portfolio Management v. Karen Caston*, No. 08 M1 129653 (Cook Co. Cir. Ct.), filed on April 11, 2008, NCO seeks to collect on an alleged credit card debt that it allegedly purchased from Citibank.
>
> *Response:*    Admitted.  (Exhibit B at 2.)

11.      Defendant has also disclosed that, since January 1, 2008, 595 lawsuits have been filed against Illinois residents seeking collection on debts.  (Exhibit B at 8-9.)

12.      Discovery may be had if the material sought is relevant to the case.  Fed.R.Civ.P. 26(b)(1).  Defendant's knowledge of the FDCPA and the ICAA is, without doubt, relevant to plaintiff's claims under those statutes.  Defendant's refusal to provide responsive information because of its erroneous legal claim that it is not a debt collector is not appropriate in the context of discovery.  The question of whether a party is right on the law is for another day.  Here, the question is whether the information sought is relevant; "arguments based upon assumptions regarding the merits of the case... are misplaced in a discovery dispute."  *Robbins v. NCO Financial Systems, Inc.*, 2006 U.S. Dist. LEXIS 89962, *13 (N.D.Ind. Dec. 12, 2006).  Plaintiff's claims deal with an attempt to collect on a debt, and are made under debt collection statutes; the

request for documents demonstrating defendant's knowledge of the law is certainly relevant.

13.    Defendant provided no substantiation of the supposed burdens imposed by plaintiff's discovery request. Stating that an undue or oppressive burden has been imposed, without more, is not enough to justify failing to respond to discovery. *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982). *Accord*, *Schaap v. Executive Industries, Inc.*, 130 F.R.D. 384, 387 (N.D.Ill. 1990). Nor has defendant explained why the information sought is privileged or confidential.

*History of past complaints of non-compliance*

14.    Requests for Production 6-10 of the first set of requests seek information regarding complaints brought against defendant for its collection practices. Defendant objected to each of these, on grounds of burden, vagueness, scope and relevancy. (Exhibit B at 13-17.)

15.    In response, plaintiff narrowed the scope of the request to those documents "relating to complaints of any kind made since January 1, 2007, and complaints made by any governmental agency, irrespective of date." (Exhibit A at Exhibit 1.) No production has been offered in response to this accommodation, however.

16.    Plaintiff has alleged that defendant has violated several laws regulating debt collection, and business practices generally. Evidence of defendant's history of compliance with these laws is therefore relevant to the case. Defendant's knowledge of these statutes through allegations of wrongdoing, and any changes (or lack thereof) that it made in response to these allegations, go to the merits of plaintiff's claims, of defendant's claimed *bona fide* error defense under 15 U.S.C. §1692k(c), and of the amount of damages to be awarded pursuant to 15 U.S.C. §1692k(b) – which is based upon "the frequency and persistence of noncompliance by the debt collector," among other things.

17.    The proposed limitation on these requests is a reasonable accommodation of the unsubstantiated burden that defendant has claimed. As such, it should be made to produce responsive information.

*Redaction of information from a contract*

18.    Defendant produced a contract between NCOP Capital, Inc. and Citibank (South Dakota), N.A. in response to discovery requests.  (Exhibit C (bates-stamped as NCO 12-32).)  This document, however, is redacted in several places.  Plaintiff requested an unredacted copy of the document; defendant refused to produce, claimed that the redacted material was proprietary, and claimed that production of this material would cause a competitive disadvantage.

19.    The redacted material includes information concerning (a) the price paid for a portfolio of alleged debts, (b) the number of accounts purchased, (c) the claimed value of the portfolio of debts, and (d) a "downstream" debt collector – *i.e.*, another debt collector who would purchase debts from NCOP Capital, Inc. after the transaction between NCOP Capital and Citibank is completed.  (Exhibit C at NCO 12, 16, 22 and 28.)

20.    Defendant's claims regarding the sensitivity of this information – with the exception of NCOP Capital's purchase price – are not well taken.  Defendant is in the business of collecting on debts.  The information that defendant seeks to protect is, ultimately, not a secret.  Specifically, the accounts that defendant or another company purchases, and the amount of outstanding debt on each one, is publicized through collection activities, when a collector (defendant or someone else) announces to the debtor a demand for payment.  The fact that a downstream collector is collecting on a debt that has been purchased by defendant is also not a secret, for the same reason.

21.    In fact, plaintiff has claimed in this case that defendant is not the owner of the debt.  The question of who was a "downstream" collector goes directly to this question, and would lead to the production of additional admissible information.

22.    Therefore, plaintiff is entitled to the production of a copy of Exhibit C that is not redacted, apart from the redaction of the purchase price for the portfolio of debts.[2]

---

[2] In other words, the material appearing on Exhibit C at NCO 22 (relating to "downstream" collectors) and at NCO 28 (relating to the number of debts purchased and the claimed value of those debts) should be produced, unredacted.  Material on NCO 12 and NCO 16 may be redacted, but only insofar as the material discloses the purchase price.

*Conclusion*

23.    A full opportunity to respond to legitimate discovery requests has been given to defendant.  However, defendant has used unfounded and unsupportable objections to evade production of requested materials.  Plaintiff is now entitled to full production.

24.    Furthermore, this Court "must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," unless a responding party's objections were substantially justified, or if an injustice would result.  Fed.R.Civ.P. 37(a)(5)(A).  Such fees are warranted here – particularly because defendant has used its position on the merits of the case as a reason for not producing information that is clearly relevant and discoverable.  Actions such as these are designed to delay the legitimate pursuit of discovery.

WHEREFORE, plaintiff respectfully requests that this Court direct defendant to produce, forthwith, complete responses to the discovery requests described in this motion, including documents in its possession, and to pay plaintiff's reasonable expenses incurred in making the motion, including attorney's fees.

Respectfully submitted,

s/ Thomas E. Soule
Thomas E. Soule

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KAREN CASTON-PALMER,　　　　　　　 )
also known as KAREN CASTON,　　　　　 )
individually and on behalf of the class　　 )
defined herein,　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )　　 1 : 08 CV 2818
　　　　　　　Plaintiff,　　　　　　　　 )　　 Judge Kennelly
　　　　　　　　　　　　　　　　　　　 )　　 Magistrate Judge Valdez
　　　　　　vs.　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
NCO PORTFOLIO MANAGEMENT, INC.,　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　Defendant.　　　　　　　 )

**AFFIDAVIT OF THOMAS E. SOULE PURSUANT TO LOCAL RULE 37.2**

I, Thomas E. Soule, under penalty of perjury and pursuant to 28 U.S.C. §1746 and Local Rule 37.2, hereby declare that the following is true and correct to the best of my knowledge:

1.　　　I am counsel for plaintiff in the above-entitled case.

2.　　　On August 8, 2008, defendant (through counsel) served responses to plaintiff's first and second set of discovery requests.

3.　　　On August 11, 2008, I raised in an e-mail sent to defendant's counsel a series of disputes with defendant's responses, and requested a conference on these disputes pursuant to Local Rule 37.2.

4.　　　On the morning August 21, 2008, I engaged in a teleconference with James Schultz, counsel for defendant, during which we discussed the disputes raised in my August 11, 2008 e-mail.

5.　　　Later in the day on August 21, 2008, I sent an e-mail to counsel for defendant memorializing the outstanding, unresolved disputes, as well as the disputes on which accommodations had been provided. This e-mail stated that defendant could change its position on these disputes and avoid a motion to compel production, if it elected to do so by 4:00 p.m. on August 22, 2008.

1


EXHIBIT
A

6.     Notwithstanding these attempts to obtain compliance with plaintiff's discovery requests, made in a good-faith attempt to avoid Court involvement, an accord has not been reached.

7.     Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the e-mails I sent to counsel for defendant on August 11 and 21, 2008.

All of the preceding is true and correct to the best of my knowledge.

Executed on this day, August 22, 2008 in Chicago, Illinois.

_____
Thomas E. Soule

Subscribed to and sworn before me on this day, August 22, 2008.

| Official Seal |
| Lisa D Stroud |
| Notary Public State of Illinois |
| My Commission Expires 02/15/2012 |

_____
Notary Public

2

EXHIBIT

**1**

Bloomberg No. 5208

## Thomas Soule

| | |
|---|---|
| **From:** | Thomas Soule |
| **Sent:** | Thursday, August 21, 2008 5:27 PM |
| **To:** | 'James K. Schultz'; 'Israel, Dave' |
| **Cc:** | 'Shartle, Bryan'; 'Brian Roth' |
| **Subject:** | RE: Caston-Palmer v NCO Portfolio |

As a follow up to the preceding e-mail, we would like all documents relating to complaints lodged by governmental agencies (state and federal) that were made at any time.

Thus, we intend to file a motion to compel production seeking production of materials regarding past complaints of unfair and deceptive collection practices -- modified to seek documents relating to complaints *of any kind* made since January 1, 2007, and complaints made by any governmental agency, *irrespective of date*. Please convey this proposed accomodation to your client -- along with the others described in my e-mail from about an hour ago (which appears below, with this modification underlined).

Tom

---

**From:** Thomas Soule
**Sent:** Thursday, August 21, 2008 4:44 PM
**To:** 'James K. Schultz'; 'Israel, Dave'
**Cc:** Shartle, Bryan; Brian Roth
**Subject:** RE: Caston-Palmer v NCO Portfolio

Counsel:

Per a discussion I had with Jim Schultz this morning about the discovery disputes our client has raised (which are reproduced below), it is my understanding that your client is holding to its objections on several disputes. As such, we intend to bring a motion to compel production.

Specifically, we intend to seek relief from the Court with respect to Interrogatory 6 of the first set of discovery requests, seeking information on the searchability of electronic records maintained by NCO. There is no reason why this information cannot be produced to us. Your client has hundreds of thousands (if not more) of account records, and has produced to us a copy of one of these records -- namely, our client's record. There must be some way in which to search through these records -- for things such as the attorneys to which an account has been referred, or the charge-off dates, or the names and addresses of class members. We are entitled to this information.

We also will seek relief with respect to Request for Production 3 of the first set of discovery requests, seeking production of documents which state standards, policies and practices relating to the FDCPA, the ICAA or other state statutes. As was discussed at length, we believe that NCO is engaging in collection activities as the plaintiff in scores of lawsuits filed in Illinois courts. Your disagreement notwithstanding, we are entitled to production.

We will also move to compel the production of documents responsive to Requests for Production 6-10, seeking production of materials regarding past complaints of unfair and deceptive collection practices -- modified to seek documents relating to complaints *of any kind* made since January 1, 2007, and complaints made by any governmental agency, *irrespective of date*. [This represents the change we have made to the previous e-mail.] We are not willing to limit these production requests to (a) what you (erroneously) refer to as "procedural" errors, or (b) complaints regarding statute-of-limitations claims. However, to reduce the burden your client has claimed, the time-frame would be shortened up. (If you are willing to produce documents under this limitation, please let me know immediately.)

We will also seek the production of an unredacted copy of the contract produced to us in discovery -- except for the price paid for the accounts by NCO. Your client's claims that the other information is proprietary is not well-taken. The fact that your client makes "downriver sales" to other debt collectors is by no means a secret -- nor can it be, as actions are taken against debtors by downriver collectors. The number of accounts sold, and the aggregate value of the debts, are not a secret either, for the same reason. Your client (or a downriver collector) announces to third-parties (namely, debtors) that

it is collecting a purported debt of a certain amount -- there is nothing proprietary about it.  Thus, the only redaction we can accept is that which relates to the price NCO paid for the accounts; other than that, we are entitled to an unredacted copy.

**With respect to all of the previous items, we will go ahead with our motion unless you inform me that your client is willing to produce documents to us immediately.  Please call me by 4:00 p.m. on Friday if your client wishes to reverse course.**

-----

With regard to all other discovery requests, we reserve our right to seek relief from the Court.  However, we are willing to accomodate supplemental responses and productions, as discussed earlier today.  Specifically:

- On Request for Admission 5 (regarding whether an assignment was attached), I understand that your client will be supplementing its response.
- With respect to requests regarding net worth, it is my understanding that information current as of the second quarter of this year will be available in or around early September.  We would request production of that information when it is ready.  We also request that your client produce, at once, quarterly and annual financial statements in its possession at this time, consistent with Request for Production 20 (seeking production of all such information for the past three years).
- You mentioned this morning that e-mails were exchanged between NCO Portfolio Management and Citibank after our client brought suit.  We request production of those e-mails, pursuant to Interrogatory 4 and Request for Production 13 of the first set of requests (and any other relevant discovery requests).
- It is my understanding that you are attempting to learn whether NCO Portfolio Management was a member of any trade organizations (including, specifically), the Debt Buyers' Association.
- If I recall correctly, you said that NCO Portfolio does not possess documents that refer to the Illinois Collection Agency Act.  However, the e-mail that you (Jim) sent to me after our conference suggests otherwise, as you sought information from the Department of Professional Regulation about the ICAA.  Therefore, we request production of all other documents (other than this e-mail) that are responsive.
- You said that documents relevant to the *bona fide* error defense, as it relates to suing on time-barred debts, would be produced.  Meanwhile, you also stated that there may not be documents that support such a defense as it relates to the assignment question.
- Finally, you said that you would produce (a) the "signature ready" affidavit and the "eRecoverEase" user manual referred to in the standard operating procedure booklet that was previously produced.

With regard to all of these accomodations, we are now entitled to a date certain (in the near future) for production.  We served these discovery responses upon you in late June, and provided you with two additional weeks to respond.  All told, your client has had these requests in its possession for just under two months now.  **Therefore, I respectfully request that a date certain for production on all of these items be supplied by 4:00 p.m. on Friday, and that all responsive documents in your client's possession, and supplemental responses, be delivered to our offices immediately, and in no case any later than August 29, 2008.**  (This, basically, includes all of the preceding points except for the second quarter financial statements, which would be ready as you said in or around early September).

If you have any questions or concerns, please do not hesitate to get in touch.  Thanks.

Tom


Thomas E. Soule, Esq.
Edelman Combs Latturner & Goodwin LLC
120 South LaSalle Street, 18th Floor
Chicago IL 60603
(312) 739-4200
(312) 917-4535 (direct)
(312) 419-0379 (fax)

---

**From:** Thomas Soule

8/22/2008

**Sent:** Monday, August 11, 2008 3:14 PM
**To:** 'James K. Schultz'
**Cc:** Israel, Dave
**Subject:** Caston-Palmer v NCO Portfolio

Counsel:

I am writing to raise several discovery disputes with you, pursuant to Local Rule 37.2.

*Written responses*

For the sake of clarity, references to discovery requests are to our client's first set of discovery requests, except where noted.

The answer given to Request for Admission 5, over your client's objection, does not meet the substance of the request. Request for Admission 5 asks your client for an admission that the complaint in *NCO Portfolio v Caston* "does not include or attach an assignment manifested by a written agreement...." Your client responded by saying that it possessed such an agreement. This does not answer the question of whether such an agreement was attached to the complaint. Please have your client provide a definitive response to the question that was asked.

With respect to questions regarding net worth (Requests for Admission 11-14, Interrogatory 12, Request for Production 20), your client stated that it would produce responsive documents. Please provide a date certain on which your client will produce this information to us.

In Interrogatory 4, your client identifies the purchase and sale agreement (bates-labeled as NCO 12-32 and produced pursuant to Requests for Production 13-16, and also Request for Production 3 **of the second set of discovery requests**) as a communication between NCO and Citibank, the original creditor, relating to our client's alleged debt. Please confirm that this is the only communication between NCO and Citibank regarding our client; if this is not the case, your client should immediately provide supplemental responses listing, and producing, all other communications that are responsive to the interrogatory.

With respect to Interrogatory 6, your client declined to respond on the grounds that the request regarding the searchability of computer databases was seeking irrelevant and proprietary information. We respectfully disagree. The information sought is relevant, as we claim that there is material that must be attached to a complaint; thus, information that is provided for litigation purposes is relevant, as is the ability to search for such documents on your client's databases. Further, the identification of the names and mailing addresses of class members is relevant to class certification issues; we therefore can ask for, and receive, information on searchability of your client's database. I note that your client has produced a fact sheet (NCO 1-11), at the beginning of which there are a series of fields (name, address, phone, balance due, etc.). I believe that your client can answer Interrogatory 6 without revealing any trade secrets. Therefore, please have your client inform us whether searches on fields listed in the fact sheet can be performed.

With respect to identifying trade group memberships and publications received (Interrogatories 11 and 12, as well as Interrogatory 1 **of the second set of discovery requests**), we believe that there is no undue burden here. It is well within the abilities of a business to know what business organizations it belongs to. At any rate, a claim of such a burden does not mean that no response whatsoever can be given. This is doubly true for the specific request that was made in Interrogatory 1 **of the second set of requests**, which asked whether NCO was a member of the Debt Buyers Association and whether it received publications from it. If there are ways in which the burden can be reasonably reduced, I am open to suggestion. However, absent that, we are entitled to full production.

Our client has alleged that your client has violated the Fair Debt Collection Practices Act, the Illinois Collection Agency Act, and the Illinois Consumer Fraud Act. Your client has responded to Request For Production 3 -- which asks for documents relating to policies and practices regarding these laws -- by stating that "none of the allegations in this case involve NCO's collection activities." Your client has admitted that "in NCO's complaint in the matter entitled [NCO v Caston-Palmer], NCO seeks to collect on an alleged credit card debt that it allegedly purchased from Citibank." *Our client's complaint is about nothing besides your client's collection activities.* If you wish to offer a suggestion as to how to reduce claimed burdens, please do so. Otherwise, please have your client produce responsive documents immediately.

We have requested in Request for Production 5 "all documents (irrespective of date) referring to the Illinois Collection Agency Act." Your client's objection claims that the request is "vague, ambiguous and ill-defined." I fail to see how a simple request for production like this one can merit such an objection. Your client should produce documents to us that are responsive to this request.

Documents responsive to questions relating to your client's past history of compliance (Requests for Production 6-10) should also be produced; we are willing, however, to discuss ways in which burdens can be reduced. Your client has claimed that it has a *bona fide* error defense; past failures to comply with the law go to whether compliance procedures were reasonably designed and implemented in order to avoid such failures to comply.

By the same token, your client cannot claim a *bona fide* error defense under 15 U.S.C. 1692k(c) and refuse to produce documents requested by Request for Production 18, "relating to the maintenance by NCO of procedures adapted to avoid any violation of the Fair Debt Collection Practices Act or any other statute or law relating to debt collection" on the grounds that such a request seeks irrelevant information. Any claimed burdens should be disclosed. Absent that, your client should either agree to produce responsive documents or immediately move to withdraw its *bona fide* error defense.

With respect to Request for Production 1 **of the second set of discovery requests**, please provide a date certain for the production of responsive documents, as indicated in your client's response.

In Requests for Production 6 and 7 **of the second set of discovery requests**, our client is seeking any documents concerning complaints about whether a debt that NCO purchased (Request 6) or sold (Request 7) was conveyed with good title. For example: if an alleged debtor claimed that NCO did not have good title to an alleged debt, did NCO complain to the creditor from which NCO bought the debt? If so, are there documents relating to that? If so, those should be produced. With that explanation, please produce responsive documents, or explain why production is burdensome. Such documents are relevant to this case, as we claim that the failure to demonstrate good title can and does lead to collection abuse, such as dunning from multiple debt collectors who all claim to have the right to collect.

*Produced documents*

NCO 12-32 purports to be a contract entered into between NCO and Citibank (South Dakota), NA. There are several redactions. We request the immediate production of an unredacted, unaltered copy of this document; your client has given no rationale for the production of redacted documents, specifically identifying the reasons why this material should be redacted.

With respect to the attorney network standard operating procedures (NCO 33 - 99), there appear to be several inconsistencies. For example, Section 4.1.6.1 (NCO 45) states that an attorney firm must submit a pleading to NCO for its review. However, NCO claims that it does not have any copies of any pleadings filed on its behalf by collection law firms, and never receives such documents. Therefore, we question your client's responses to Requests for Production 11 and 12 (of the first set of discovery requests) and similar discovery requests, and demand the immediate production of all responsive documents and supplemental written responses.

Furthermore, there are a couple of documents referred to in the SOP document. There is a model, "signature ready" affidavit for use in collection cases (Section 4.4.1 (NCO 50-51)), and a copy of Appendix C to the user manual which describes the "eRecoverEase" program, which is referred to often throughout the document (see NCO 57). These documents should be produced to us.

*Conclusion*

With respect to any of our client's requests, we reserve the right to raise further discovery objections as this case progresses.

Based upon the many ways in which your client has avoided answering legitimate discovery requests, we reiterate our objection to your client's planned filing of an early summary judgment motion. The facts that have been disclosed, and those that have not, demand that the discovery process continue, and that summary judgment motions be brought only upon a fully-developed factual record.

Please get in touch with me to discuss these matters fully, at your first convenient opportunity. Thank you very much.

Tom

Thomas E. Soule, Esq.
Edelman Combs Latturner & Goodwin LLC
120 South LaSalle Street, 18th Floor
Chicago IL 60603
(312) 739-4200

8/22/2008

(312) 917-4535 (direct)
(312) 419-0379 (fax)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KAREN CASTON-PALMER,  )
individually and on behalf of the class,  )
                                          )
                Plaintiff,                )        Judge Kennelly
                                          )
        -vs-                              )        Case No. 08 C 2818
                                          )
NCO PORTFOLIO MANAGEMENT,                 )        Magistrate Judge Valdez
INC.,                                     )
                                          )
                Defendant.                )

NCO PORTFOLIO MANAGEMENT, INC.'S RESPONSES
TO PLAINTIFF'S FIRST DISCOVERY REQUESTS

NOW COMES Defendant NCO Portfolio Management, Inc. (NCO), by and

through the undersigned counsel and pursuant to Federal Rule of Civil Procedure 33, 34,

and 36, hereby submits the following responses to Plaintiff's First Discovery Requests.

REQUESTS FOR ADMISSIONS

1.      Defendant NCO is a Delaware corporation that does business in Illinois.

Response:    Admitted.

2.      NCO, as part of its business, claims to purchase charged-off debts allegedly

owed by consumers (including credit card debts) for a fraction of face value, and brings

collection actions against alleged debtors.

Response:    Objection; this request is argumentative and vague. Subject to

and notwithstanding said objection, NCO admits that a part of its business involves



EXHIBIT
B

1

the purchase of debts actually owed by consumers, including credit card debts. NCO purchases these debts in a portfolio and therefore can neither admit nor deny that the debts being purchased are "for a fraction of face value." NCO denies that it brings collection actions against alleged debtors in Illinois.

3.    Defendant NCO is a "debt collector" as defined in the FDCPA.

**Response:    Denied.**

4.    In NCO's complaint in the matter entitled *NCO Portfolio Management v. Karen Caston*, No. 08 M1 129653 (Cook Co. Cir. Ct.), filed on April 11, 2008, NCO seeks to collect on an alleged credit card debt that it allegedly purchased from Citibank.

**Response:    Admitted.**

5.    The complaint filed on April 11, 2008 in *NCO Portfolio Management v. Karen Caston*, No. 08 M1 129653 (Cook Co. Cir. Ct.), does not include or attach an assignment manifested by a written agreement, separate from and in addition to any document intended for the purpose of listing a debt with a collection agency, pursuant to and consistent with the Illinois Collection Agency Act, 225 ILCS 425/8b.

**Response:    Objection.**  This request incorrectly asserts that the Illinois Collection Agency Act requires an assignment to be attached to a complaint. Subject to and without waiving its objection, NCO admits that it had a written purchase agreement with the original creditor assigning and transferring title to the account to NCO at the time suit was filed.

6.    An officer, manager, or employee of NCO reviewed, and approved of, the complaint in *NCO Portfolio Management v. Karen Caston*, No. 08 M1 129653 (Cook Co. Cir. Ct.), and all attachments thereto, prior to its filing in Court on April 4, 2008.

**Response:   Denied.  NCO relies on collection counsel to prepare and file complaints.**

7.    There are more than 40 individuals against whom defendant NCO Portfolio Management, Inc. filed a collection lawsuit in Illinois after January 1, 2008, without attaching to the complaint an assignment that complied with § 8b of the Illinois Collection Agency Act.

**Response:   NCO admits that more than 40 lawsuits were filed on behalf of NCO subsequent to January 1, 2008.  NCO denies that it failed to have a written assignment of those accounts at the time suit was filed.**

8.    There are more than 100 individuals against whom defendant NCO Portfolio Management, Inc. filed a collection lawsuit in Illinois after January 1, 2008, without attaching to the complaint an assignment that complied with § 8b of the Illinois Collection Agency Act.

**Response:   NCO admits that more than 100 lawsuits were filed on behalf of NCO subsequent to January 1, 2008.  NCO denies that it failed to have a written assignment of those accounts at the time suit was filed.**

9.    There are more than 500 individuals against whom defendant NCO Portfolio Management, Inc. filed a collection lawsuit in Illinois after January 1, 2008,

without attaching to the complaint an assignment that complied with § 8b of the Illinois Collection Agency Act.

Response:   NCO admits that more than 500 lawsuits were filed on behalf of NCO subsequent to January 1, 2008.  NCO denies that it failed to have a written assignment of those accounts at the time suit was filed.

10.    There are more than 1,000 individuals against whom defendant NCO Portfolio Management, Inc. filed a collection lawsuit in Illinois after January 1, 2008, without attaching to the complaint an assignment that complied with § 8b of the Illinois Collection Agency Act.

Response:   Denied.

11.    Defendant NCO has a net worth exceeding $1 million.

Response:   After reasonable investigation, NCO is not currently able to either admit or deny this request.  NCO is currently investigating this request and calculating its net worth.  This process will take additional time.

12.    Defendant NCO has a net worth exceeding $5 million.

Response:   After reasonable investigation, NCO is not currently able to either admit or deny this request.  NCO is currently investigating this request and calculating its net worth.  This process will take additional time.

13.    Defendant NCO has a net worth exceeding $10 million.

Response:   After reasonable investigation, NCO is not currently able to either admit or deny this request.  NCO is currently investigating this request and calculating its net worth.  This process will take additional time.

4

14.   Defendant NCO has a net worth exceeding $50 million.

**Response:**   After reasonable investigation, NCO is not currently able to either admit or deny this request.  NCO is currently investigating this request and calculating its net worth.  This process will take additional time.

## INTERROGATORIES

1.   State the name, address, title and job description of each officer, director and employee (present or former) of NCO who can testify to any of the following subjects:

   a.   The documents that NCO can or does acquire when it purchases debts; or

   b.   NCO's practices with respect to bringing suits alleged against debtors; or

   c.   NCO's review and approval of the complaint filed in (*sic*) matter entitled *NCO Portfolio Management v. Karen Caston*, No. 08 M1 129653 (Cook Co. Cir. Ct.), or documents attached to that complaint; or

   d.   NCO's knowledge of and compliance with the Illinois Collection Agency Act, 225 ILCS 425/1 *et seq*, the Illinois Consumer Fraud Act, 815 ILCS 505 *et seq*. and the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*.

**Answer:**     Objection.  This interrogatory is vague, ambiguous, overly broad, excessive in time and scope and ill-defined.  Subject to and without waiving said objection, the following NCO corporate representatives are able to testify about the above matters:

> Anthony Albanese
> Vice President Purchase Portfolio
>
> David Schlee, Esq.
> Attorney Network Services

2.     Please state whether Sarah Abrahams, an "agent" who submitted an affidavit attached to the complaint in *NCO Portfolio Management v. Karen Caston*, No. 08 M1 129653 (Cook Co. Cir. Ct.) (attached hereto as Exhibit 1), is employed by NCO Portfolio Management.  If so, please state her address, title, job description and actions taken with regard to the *NCO Portfolio Management v. Karen Caston* complaint; if not, please state the name, address, telephone number, and other contact information for her employer.

**Answer:**     Objection.  This interrogatory seeking a description of "actions taken" calls for a narrative response appropriate for a deposition.  Subject to and without waiving said objection, Sarah Abrahams is employed by NCO as a collector and can be contacted through counsel.

3.     Identify by code name or number (if available), by form of communication (*e.g.*, letter, phone call, e-mail, fax, etc.) and by date, all communication made to plaintiff in an effort to collect the alleged debt that was the subject of *NCO Portfolio Management*

*v. Karen Caston*, No. 08 M1 129653 (Cook Co. Cir. Ct.), which was filed in the Circuit Court of Cook County on April 11, 2008.

**Answer:**    See account notes tendered in response to Plaintiff's Request for Production of Documents as Bates No. NCO 00001 – NCO 00012.

4.    Identify by form of communication, by persons involved, and by date, all communications between NCO and Citibank regarding the debt NCO sought to collect in *NCO Portfolio Management v. Karen Caston*, No. 08 M1 129653 (Cook Co. Cir. Ct.).

**Answer:**    Objection.  This interrogatory is not relevant or reasonably tailored to lead to the discovery of admissible information, and seeks information that is confidential and contains proprietary information.  Subject to and notwithstanding said objection, see a redacted copy of the Purchase and Sales Agreement produced in response to Plaintiff's Request for Production of Documents as Bates No. NCO 00012 – NCO00032.

5.    Describe all document destruction and retention policies of NCO.

**Answer:**    Objection.  This interrogatory calls for a narrative answer appropriate for a deposition.  Subject to and without waiving said objection, NCO does not have a written document destruction and retention policy.

6.    State whether information regarding your accounts is retrievable by computer and, if so, each field by which data is searchable or retrievable.  State whether your computer can determine (a) the number of instances a collection action was brought

on behalf of NCO against alleged debtors, (b) the number of such lawsuits which were based upon debts that NCO purchased, (c) the documentation NCO submitted to Courts in order to support NCO's claim against alleged debtors, and (d) the names and last known addresses of alleged debts who are or were defendants in such collection actions brought on behalf of NCO.

   <u>Answer:</u>    Objection.    This interrogatory seeks information that is confidential and contains proprietary information.  This interrogatory also seeks information that is not relevant nor reasonably tailored to lead to the discovery of relevant information.

   7.    Please state whether NCO obtains and then retains copies of complaints filed on its behalf against alleged debtors, seeking collection on alleged debts, stating specifically who at NCO (or what department of NCO) receives these complaints, who receives a copy of the complaint when it was received, who retains these complaints, when they are first received by NCO, and how they are reviewed by NCO.

   <u>Answer:</u>    No.

   8.    State the number, names, and addresses of individuals against whom defendant NCO Portfolio Management, Inc. filed a collection lawsuit in Illinois after January 1, 2008, without attaching to the complaint an assignment that complied with § 8b of the Illinois Collection Agency Act.

   <u>Answer:</u>    NCO is aware that 595 lawsuits have been filed in Illinois on its behalf since January 1, 2008.  Because NCO relies on its counsel to prepare and file

the lawsuits, NCO is unable to identify which of these complaints did not attach a copy an assignment.

9.    If you contend that any of the persons who are described in the preceding interrogatory incurred the alleged debts sought to be collected for business purposes, identify the persons and state the facts upon which you base your contention.

Answer:    Undetermined at this time.

10.    Identify all trade associations relating to debt collection to which you belong.

Answer:    Objection.  This interrogatory seeks information that is not relevant nor reasonably tailored to lead to the discovery of relevant information. NCO is a large and complex organization with numerous departments that may belong to responsive "trade associations."  To respond to Plaintiff's broad and general interrogatory, and to identify all such trade associations, would take numerous man-hours and months to identify.

11.    List all publications and periodicals relating to debt collection which you subscribe to or receive on a regular basis.

Answer:    Objection.  This interrogatory  is overly broad and unduly burdensome.  To the extent that Plaintiff seeks identification of all documents received by NCO, NCO states that it is a large and complex organization with numerous departments that may have received such materials.  Therefore, to

respond to Plaintiff's broad and general request, and identify all such documents, would take numerous man-hours and months to identify.

12.    State the net worth of NCO Portfolio Management.  In the alternative, please produce the most recent balance sheet for NCO Portfolio Management.

**Answer:**    NCO will produce responsive financial statements.

13.    Identify all credit applications and financial statements issued or submitted by NCO in the last 3 years.

**Answer:**    Objection; said interrogatory seeks production of proprietary information that is privileged and confidential, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information.

14.    Explain the basis for any claim that any violation was unintentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error.  Identify what procedures are maintained and how they are adapted to avoid the matters complained of.  State whether retaining or obtaining the advice of counsel was any part of such procedures, and if so, identify the counsel involved.

**Answer:**    Objection.  This interrogatory is pre-mature as discovery in this case has just begun.  Subject to and without waiving said objection, NCO relies on its retained counsel to comply with Illinois' Code of Civil Procedure in filing suit.

15.     If your response to any of the requests for admissions is anything other than an unqualified admission, please explain the basis for your denial.

**Answer:**     Objection; said interrogatory calls for a narrative response properly suited for a deposition.  Subject to and notwithstanding said objection, see NCO's responses to Plaintiff's Request for Admissions and documents tendered in response to Plaintiff's Request for Production of Documents for the basis on NCO's denials.

16.     With respect to each expert whom you will or may call upon to give admissible evidence or testimony in connection with this case, please state his name, address, telephone number, occupation, and current employment; the subject matter of his expertise; his educational background, academic degrees, employment history, employment experience, and any other matters which you contend qualify him as an expert; the substance of all facts and opinions to which he could testify if called as a witness; and a summary of the grounds for each such opinion.

**Answer:**     NCO has not determined whether an expert witness(es) will be retained and disclosed in this case.  NCO will supplement this response consistent with the applicable Case Management Order.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.     All documents transmitted to plaintiff by NCO, with respect to the alleged debt of plaintiff, including but not limited to all documents that were filed in, or relate to, *NCO Portfolio Management v. Karen Caston*, No. 08 M1 129653 (Cook Co. Cir. Ct.).

<u>Response</u>:   NCO does not maintain actual copies of these documents.  See documents produced herewith as Bates No. NCO00001 – NCO00011 for a summary of those documents.

2.    All documents relating to plaintiff, or which are indexed, filed or retrievable under plaintiff's name or any number, symbol, designation or code (such as an account number or Social Security number) assigned to plaintiff.

<u>Response</u>:   See documents produced herewith, Bates No. NCO00001 – NCO00011.

3.    All manuals, memoranda, instructions and other documents which discuss, describe or set forth standards, criteria, guidelines, policies or practices relating to the Fair Debt Collection Practices Act, the Illinois Collection Agency Act, or other state statutes regulating debt collectors or debt collection.

<u>Response</u>:   Objection; said request seeks production of proprietary information that is privileged and confidential, is overly broad, unduly cumbersome, burdensome and oppressive, ill-defined, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information.  None of the allegations in this case involve NCO's collection activities.

4.    All manuals, memoranda, instructions, and other documents setting forth NCO's policies, procedure or practices relating to the collection of debts and the filing of collection actions against alleged debtors.

12

_Response_: Objection; said request seeks production of proprietary information that is privileged and confidential, is overly broad, unduly cumbersome, burdensome and oppressive, ill-defined, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information.  Notwithstanding said objections, produced as Bates Nos. NCO00033 – NCO00099 are NCO's guidelines as to when collections lawsuits are filed.

5.    All documents (irrespective of date) referring to the Illinois Collection Agency Act.

_Response_: Objection; said request is vague, ambiguous and ill-defined.

6.    All documents relating to any judicial or administrative proceeding (irrespective of date) in which NCO was accused of violating the Fair Debt Collection Practices Act, any state statute regulating collection practices, or of committing a tort while engaging in collection activities.

_Response_:   Objection; said request is overly broad, unduly cumbersome, burdensome and oppressive, ill-defined, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information.  Objecting further, evidence of other complaints filed against NCO is inadmissible and not likely to lead to the discovery of admissible evidence under Rule 404 of the Federal Rules of Evidence when offered to demonstrate that prior lawsuits or claims against NCO are evidence of the validity of Plaintiff's current

13

claims. Therefore, any lawsuits in the past cannot serve to buttress the merits of Plaintiff's case. Notwithstanding said objections, NCO has no meaningful ability to furnish the requested the information. To the extent Plaintiff seeks matters of public record, such information is equally accessible to Plaintiff and may be readily ascertained by review of respective court records.

7.    All documents relating to any complaint, criticism or inquiry, by any person, concerning NCO's compliance with the Fair Debt Collection Practices Act, or state statutes regulating debt collection activities, or collection practices generally.

Response:   Objection; said request is overly broad, unduly cumbersome, burdensome and oppressive, ill-defined, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information. Objecting further, evidence of other complaints filed against NCO is inadmissible and not likely to lead to the discovery of admissible evidence under Rule 404 of the Federal Rules of Evidence when offered to demonstrate that prior lawsuits or claims against NCO are evidence of the validity of Plaintiff's current claims. Therefore, any lawsuits in the past cannot serve to buttress the merits of Plaintiff's case. Notwithstanding said objections, NCO has no meaningful ability to furnish the requested the information. To the extent Plaintiff seeks matters of public record, such information is equally accessible to Plaintiff and may be readily ascertained by review of respective court records.

8.    All documents (irrespective of date) relating to any claim made against NCO for violating the Fair Debt Collection Practices Act, any state statute regulating collection practices, or of committing a tort while engaging in collection activities.

**Response:**   Objection; said request is overly broad, unduly cumbersome, burdensome and oppressive, ill-defined, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information.   Objecting further, evidence of other claims filed against NCO is inadmissible and not likely to lead to the discovery of admissible evidence under Rule 404 of the Federal Rules of Evidence when offered to demonstrate that prior claims against NCO are evidence of the validity of Plaintiff's current claims. Therefore, any claims in the past cannot serve to buttress the merits of Plaintiff's case.  Notwithstanding said objections, NCO has no meaningful ability to furnish the requested the information.  To the extent Plaintiff seeks matters of public record, such information is equally accessible to Plaintiff and may be readily ascertained by review of respective court records.

9.    All documents (irrespective of date) which constitute or reflect communications between NCO and public or private agencies that receive consumer complaints (such as an Attorney's General's office, the Federal Trade Commission, a Better Business Bureau or newspaper column), relating to collection activities of NCO.

**Response:**   Objection; said request is overly broad, unduly cumbersome, burdensome and oppressive, ill-defined, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible

information.    Objecting further, evidence of complaints filed against NCO is inadmissible and not likely to lead to the discovery of admissible evidence under Rule 404 of the Federal Rules of Evidence when offered to demonstrate that prior complaints against NCO are evidence of the validity of Plaintiff's current claims. Therefore, any complaints in the past cannot serve to buttress the merits of Plaintiff's case. Notwithstanding said objections, NCO has no meaningful ability to furnish the requested the information.    To the extent Plaintiff seeks matters of public record, such information is equally accessible to Plaintiff and may be readily ascertained by review of respective court records.

10.    All documents (irrespective of date) that discuss NCO's compliance or lack of compliance with the Fair Debt Collection Practices Act, the Illinois Collection Agency Act, or the Illinois Consumer Fraud Act.

Response:    Objection; said request seeks disclosure of proprietary information that is privileged and confidential, is overly broad, unduly cumbersome, burdensome and oppressive, ill-defined, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information.    Objecting further, evidence of putative violations allegedly committed NCO is inadmissible and not likely to lead to the discovery of admissible evidence under Rule 404 of the Federal Rules of Evidence when offered to demonstrate that prior possible violations by NCO are evidence of the validity of Plaintiff's current claims.    Therefore, any violations in the past cannot serve to buttress the merits of Plaintiff's case.    Notwithstanding said objections, NCO has no

meaningful ability to furnish the requested the information. To the extent Plaintiff seeks matters of public record, such information is equally accessible to Plaintiff and may be readily ascertained by review of respective court records.

11.    All complaints filed by NCO Portfolio Management in Illinois since January 1, 2008, which seek or sought collection from consumers on alleged debts.

Response:    NCO does not have documents responsive to this request in its possession.

12.    All complaints filed by NCO Portfolio Management in Illinois between October 1, 2007 and December 31, 2007, 2008, which seek or sought collection from consumers on alleged debts.

Response:    NCO does not have documents responsive to this request in its possession.

13.    All documents exchanged between NCO and Citibank regarding the debt allegedly owed by plaintiff in this matter.

Response:    Objection; said request seeks production of proprietary information that is privileged and confidential, is overly broad, unduly cumbersome, burdensome and oppressive, ill-defined, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information. Subject to and without waiving said objection, see the redacted Purchase and Sale Agreement produced herewith as Bates No. NCO00012 – NCO00032.

17

14.    All agreements with the person or persons from whom you obtained plaintiff's alleged debt, or the right to collect the same.

**Response:**    See the redacted Purchase and Sale Agreement produced herewith as Bates No. NCO00012 – NCO00032.

15.    All agreements authorizing you to conduct collection activities with respect to Plaintiff.

**Response:**    Objection; said request is vague, ambiguous and ill-defined. Objecting further, NCO did not engage in any "collection activities" related to Plaintiff's account.  Subject to and without waiving said objection, see response to Request No. 13.

16.    All documents showing evidence of an assignment of the debt allegedly owed by plaintiff from Citibank to NCO.

**Response:**    See response to Request No. 13.

17.    All insurance policies that may afford coverage with respect to the matters complained of, together with all correspondence accepting or declining coverage or reserving rights with respect thereto.

**Response:**    See the declarations page attached herewith as Bates No. NCO00100 – NCO00101.

18.    All documents relating to the maintenance by NCO of procedures adapted to avoid any violation of the Fair Debt Collection Practices Act or any other statute or law relating to debt collection.

Response: Objection; said request seeks production of proprietary information that is privileged and confidential, is overly broad, ill-defined, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information.

19. All documents setting forth NCO's document destruction and retention policies.

Response: Objection; said request seeks production of proprietary information that is privileged and confidential, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information. Notwithstanding said objections, NCO has no written documents responsive to this request.

20. NCO's annual financial statements, annual reports, semiannual and quarterly financial statements, credit application and tax returns for the last three years.

Response: Objection; said request seeks production of proprietary information that is privileged and confidential, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information. Subject to and notwithstanding said objection, NCO will produce responsive financial statements.

21. The complete file, including but not limited to computer information, for all individuals against whom defendant NCO Portfolio Management, Inc. filed a collection lawsuit in Illinois after January 1, 2008, without attaching to the complaint an assignment that complied with § 8b of the Illinois Collection Agency Act.

**Response:**    Objection; said request unduly burdensome, is excessive in time and scope, and is neither relevant nor reasonably tailored to lead to the discovery of relevant and admissible information.  NCO relies on its retained counsel to prepare and file complaints.  NCO therefore has no ability to identify which of the 595 lawsuits filed on its behalf in the state of Illinois since January 1, 2008 may not have had a copy of an assignment attached thereto.

AS TO OBJECTIONS:

James K. Schultz

James K. Schultz
SESSIONS, FISHMAN, NATHAN & ISRAEL OF ILLINOIS, LLC
55 West Monroe, Suite 1120
Chicago, Illinois  60603
Telephone:  (312) 578-0990
Facsimile:  (312) 578-0991
E-Mail:    jschultz@sessions-law.biz

David Israel
SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.P.
Lakeway Two, Suite 200
3850 North Causeway Boulevard
Metairie, LA 70002-7227
Telephone:  (504) 828-3700
Facsimile:  (504) 828-3737
E-Mail:    disrael@sessions-law.biz

Attorneys for Defendant NCO Portfolio Management, Inc.

20

## VERIFICATION

The undersigned, under the penalties as provided by law, hereby verifies and certifies that the statements contained in the foregoing Answers to Plaintiff's Interrogatories are true and accurate, except as to those matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that she/he verily believes the same to be true.

_ANTHONY ALBANESE_
Printed Name

_VICE PRESIDENT PURCHASE PORTFOLIO_
Title

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing NCO'S RESPONSES TO PLAINTIFF'S FIRST DISCOVERY REQUEST was served on the following attorneys of record via electronic mail and U.S Mail, postage paid, on this the 8th day of August, 2008.

Daniel A. Edelman
Thomas E. Soule
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 South LaSalle Street
18th Floor
Chicago, Illinois 60603

_____
Attorney for Defendant NCO

# NCOP CAPITAL, INC.
## PURCHASE AND SALE AGREEMENT

### September 2004 Bankcard Accounts/Associates Lot #7

This Purchase and Sale Agreement (the "Agreement") is made as of September 30, 2004, between Citibank (South Dakota), National Association (the "Bank"), a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, South Dakota 57117 and NCOP Capital, Inc. ("Buyer"), organized under the laws of the State of Nevada, with its headquarters/principal place of business at 3763 Howard Hughes Parkway, Suite 170, Las Vegas, NV 89109.

WHEREAS, the Bank desires to sell and Buyer desires to purchase certain of the Bank's credit card accounts on the terms and conditions hereinafter provided;

NOW, THEREFORE, in consideration of the mutual promises herein, Buyer and Bank agree as follows:

1. DEFINITIONS

1.1    "Account Document" means, with respect to any account, any application, agreement, billing statement, notice, correspondence or other information in the Bank's possession that relates to an Account. An Account Document may include, without limitation, original documents or copies thereof, whether by photocopy, microfiche, microfilm or other reproduction process. Excluded from the definition of Account Document is any correspondence, report, information, internal analyses, sensitive attorney-client privileged documents, internal memoranda, documents, credit information, regulatory reports, and/or internal assessments of valuation of such Account, or any other documents relating to an Account that may be, but are not necessarily, missing or excluded (whether intentionally or unintentionally).

1.2    "Accounts" means the Bank's Visa and MasterCard accounts and receivables listed on the Asset Schedule (attached hereto as Exhibit 1) the balances of which the Bank has written off for accounting purposes, subject to adjustment of the Cut-Off Date (as defined below) in accordance with Section 2.2.

1.3    "Cardholder" means the person in whose name an Account was established.

1.4    "Closing Date" means September 30, 2004, or such other later date mutually agreed to by Buyer and the Bank.

1.5    "Cut-Off Date" means September 28, 2004.

1.6    "Purchase Price" means  subject to Pre-Closing Adjustment pursuant to Section 2.2.

ncopcapcbsd#2-0904.doc

1



NCO 00012

1.7    "Adjustment Amount" means the portion of the Purchase Price allocated to the balance of any Account that is: (a) increased or decreased as described in Section 2.2(a); (b) retained by Bank and not transferred to Buyer pursuant to Section 2.2(b); or (c) repurchased by Bank pursuant to Sections 3.4 or 8.1. The Adjustment Amount shall be equal to the portion of the Purchase Price (prior to adjustment) attributable to the balance of the Account. This amount shall be determined by multiplying the balance by the percentage of the Purchase Price relative to the aggregate balance of Accounts associated with the unadjusted Purchase Price.

2.    PURCHASE AND SALE OF ACCOUNTS

2.1    Purchase and Sale. On the basis of, and subject to, the representations, warranties and covenants in this Agreement, the Bank agrees to sell, assign and transfer to Buyer, and Buyer agrees to purchase from the Bank on the Closing Date all right, title and interest of Bank in the Accounts. Buyer has made an independent investigation as it deems necessary as to the nature, validity, collectibility, enforceability and value of the Accounts, and as to all other facts that Buyer deems material to Buyer's purchase. Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment. Buyer has made an independent determination that the Purchase Price represents the Accounts' fair and reasonable value. The sale and assignment are without recourse to the Bank, and without warranty of any kind (including, without limitation, warranties pertaining to validity, collectibility, accuracy or sufficiency of information), except as stated in Article 3 below. Buyer acknowledges and understands that Bank has not provided the date of first delinquency of the Accounts for FCRA reporting purposes, and that it is Buyer's responsibility to obtain that information from credit reporting agencies or other sources. Buyer also understands that the account balances purchased include finance charges assessed up to the date the account was charged off by Bank. Buyer is not acting in reliance on any representation by the Bank, except as set forth in Article 3 below.

2.2    Pre-Closing Adjustment. The Purchase Price amount stated in Section 1.6 shall be adjusted to reflect any changes in the status of the Accounts as of the Cut-Off Date, as follows:

        (a)    a change in the balance of any Account from the balance shown on the due diligence tape provided to Buyer; and

        (b)    retention by the Bank of any Account that on the Cut-Off Date (i) to the Bank's knowledge, fail to meet the representations set forth in Section 3.4; or (ii) the Bank determines that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to an Account or a Cardholder, and naming the Bank or otherwise involving the Bank's interest therein in a manner unacceptable to the Bank, or the Bank otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that the Bank's interest therein cannot be adequately protected without the Bank owning such Account.

The Purchase Price will be adjusted by the Adjustment Amount associated with any balance or Account described above. The Bank will notify the Buyer of the adjusted Purchase Price prior to the Closing Date.

NCO 00013

2.3    Payment.  Buyer shall pay the balance of the Purchase Price on or before 12:00 p.m. (noon) Central Time on the Closing Date. Buyer shall withhold from the amount paid hereunder 3% of the Purchase Price ("Withheld Amount") subject to the provisions of Section 3.4(c) below. The Bank will transfer the Accounts to Buyer in accordance with Section 2.4 below.

2.4    Transfer.   On the Closing Date, subject to satisfaction or waiver of the conditions precedent set forth in Article 5 of this Agreement, the Bank and Buyer will execute and deliver to each other a Bill of Sale, Assignment and Assumption Agreement substantially in the form of Exhibit 2, and other mutually agreed upon Closing documents. The Bank will provide to Buyer, on the closing date or at such other time as is mutually agreed to by the Buyer and Bank, a computer printout or magnetic tape listing the Accounts as of the Cut-off Date that were purchased by the Buyer.  On the closing Date, Bank will transfer all Bank's right, title and interest in the Accounts and Buyer will assume, with respect to each Account, all of Bank's rights, responsibilities, and obligations that arise as a result of Buyer's purchase of the Accounts. If the Bank receives any payments of principal and/or interest by or on behalf of any Cardholder with respect to an Account between the Cut-off Date and the Closing Date, Bank shall hold such amounts in trust for Buyer and pay over such amounts to Buyer (without interest thereon) within forty-five (45) days after the Closing Date. If payments are received by the Bank from a Cardholder on or after closing date, the Bank shall forward such payments (without interest thereon) to Buyer within forty-five (45) days from date of receipt. Bank shall charge Buyer the lesser fee of fifteen percent (15%) of the payment amount, or fifteen dollars ($15.00), to process any Account payment received by Bank more than one (1) year after the Closing Date. Bank may, at its discretion, deduct the processing fee when remitting the payments to Buyer.

2.5    Sales, Use or Transfer Taxes.  If any sales, use or transfer tax is assessed or otherwise payable as a result of the transactions contemplated hereby, Buyer and Seller shall assume the obligation to pay such tax that is its responsibility to pay, to the extent such taxes relate to, or accrue on or after the Closing Date.

3.    REPRESENTATIONS AND WARRANTIES OF THE BANK

The Bank makes the following representations and warranties:

3.1    Due Organization; Authorization.  The Bank is duly organized, existing and in good standing as a national banking association, and the Bank's execution, delivery, and performance of this Agreement are within the Bank's corporate powers and have been duly authorized by all necessary corporate action.

3.2    Servicing.  After the Cut-Off Date, the Bank shall not compromise, settle (for less than full value) or otherwise release a Cardholder on any Account without Buyer's consent. The Bank will undertake only those servicing activities necessary to preserve and maintain the integrity and enforceability of the Accounts.

ncopcapcbsd#2-0904.doc

NCO 00014

3.3    Closing File. Bank represents that to the best of its knowledge and belief, and subject to the Pre-Closing Adjustments set forth in Section 2.2 above, there is not a material difference between the sale balances of accounts included in the due diligence tape made available to Buyer and the final sale balances lot of Accounts listed in Exhibit 1 purchased by Buyer.

3.4    Representations Concerning Accounts.    With respect to each Account, the Bank represents that to the best of its knowledge as of the Closing Date:

(a)    the debt represented by such Account has not been satisfied and/or the stated balance on such Account has not been paid;

(b)    each Account is a legal, valid and binding obligation of the Cardholder;

(c)    no final judgment has been entered by a court of competent jurisdiction with respect to the debt represented by the Account;

(d)    the Cardholder has not been released from liability on the Account;

(e)    the Account is not involved in an open bankruptcy case and has not been discharged in bankruptcy;

(f)    the Cardholder is not deceased;

(g)    the Bank has good and marketable title to the Account, is the sole owner thereof and has full right to transfer and sell the Account free and clear of any encumbrance, equity, lien, pledge, charge, claim, security interest, obligation to third party collection agencies or attorneys previously retained by the Bank;

(h)    there is no dispute, claim, action, suit or proceeding pending or threatened with respect to any Account;

(i)    the current balance on the Account is $100 or more;

(j)    each Account is closed and there is no requirement for future advances of credit or other performance by Bank; and

(k)    each Account has been maintained and serviced by Bank in full compliance with applicable state and federal laws including where applicable, without limitation, the Truth in Lending Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Fair Credit Billing Act.

(l)    no blanket, undifferentiated offer (excluding offers that may have been made to Cardholders on a "one-off" basis) has been made to the Cardholders generally or broadly defined class of Cardholders (including any class defined by length of delinquency) which offer is either currently effective or was made within the ninety (90) day period

NCO 00015

immediately preceding the designation of any such Account Balance as a Charged-off Account Balance (including the period of time between such designation and the Closing Date) and pursuant to which such Cardholders had or have the right to compromise, reduce or otherwise adversely effect their respective Account Balances; and,

(m) a maximum of two percent (2%) of the Accounts may lack a Social Security number that can be validated through a major credit bureau service. The Buyer acknowledges and agrees that the Bank's failure to meet this representation shall not be considered a material breach of the Agreement, and Buyer's sole and only remedy for any breach of this Section 3.3 (m) shall be to require the Bank to repurchase any and all Accounts falling outside of the accuracy requirement as allowed under the procedure set forth in Section 5.5; and,

(n) to the best of Bank's knowledge, no Cardholder plans to file for bankruptcy protection with respect to any Account.

The Bank makes no other representations or warranties, express or implied, with respect to any of the Accounts other than as specifically set forth in this Section 3.3.

3.4    Remedies for Breach of Representations Concerning Accounts.

(a) Time Period. Buyer's sole remedy against Bank for a breach of any of the representations listed in Section 3.3 shall be to notify the Bank of the breach no later than 180 days from the Closing Date. Bank shall then have, at its option, the right to (A) cure such breach referred to in the notice of Claim, in all material respects, (B) reimburse to Buyer an amount (the "Purchase Price Adjustment") equal to the reduction in value of the affected Accounts based upon the breach, or (C) repurchase the affected Accounts by paying Buyer ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. A Notice of Claim under this Section 3.4 must be delivered by the Buyer to the Bank in writing and accompanied by the documentation required under Section 3.4(b). Notwithstanding Section 12.10, the Buyer's failure to provide a Notice of Claim with respect to any claimed breach of Bank as provided in this Section 3.4 shall terminate and waive any rights Buyer may have to any remedy for such breach under Section 3.3 of this Agreement.

(b) Form of Notice Required. Buyer shall notify Bank in writing of each Account of which Buyer seeks to have Bank repurchase. All notices shall contain the customer's name and Bank's account number and will be accompanied with the following applicable documentary evidence satisfactory to the Bank:

| Bankruptcies: | Credit Bureau with non-dismissed bankruptcies, or |
| | Attorney name, case number, and date of filing, or |
| | Copy of actual court papers, or approved third party service |
| | (Banko, Inc.; Experian; Trans Union; or Equifax) |

| Deceased: | Copy of death certificate, or |
| | Credit bureau indicating date of death, or |

NCO 000016

|  | Executor or attorney letter with date of death, or approved third party service (Banko, Inc.; Experian; Trans Union; or Equifax) |
|---|---|
| Settled or Paid in Full: | Copy of Bank or bank agent letter verifying action Copy of the canceled, final check (front and back) |
| Fraud: | Letter from or to Citibank or Citibank agent Complaint in writing explaining event |

Bank shall make a determination within forty five (45) business days after receipt of Buyer's Request, unless Bank's delay in responding is caused by or related to Buyer's failure to provide Bank with necessary information and documentation required under this Section 3.4.

(c)  Repurchase Price.  If the Bank elects to either repurchase the Accounts or reimburse the Buyer in the amount of the Purchase Price Adjustment, the Bank shall not be obligated to make payment on an Account by Account basis, but may elect to provide such adjustment in a single amount as an offset against the Withheld Amount within 30 days of notification, at Bank's option. Should the amount of the Repurchase Price exceed the Withheld Amount, the Bank shall make payment of the excess amount with the 30 day period set forth in this Section. If, at the end of the 180 day period set forth in Section 3.4(a) above, the Withheld Amount exceeds the amount of the Repurchase Price, Buyer shall, within 14 days, pay such excess to Bank. The Bank makes no representation as to the number of Accounts that may be subject to repurchase pursuant to this section.

## 4.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer makes the following representations and warranties:

4.1    Due Organization; Authorization.  Buyer is duly organized, existing and in good standing as a corporation under the laws of the State of Nevada. Buyer has full authority to execute, deliver and perform this Agreement according to its terms, and Buyer's execution, delivery and performance of this Agreement have been duly authorized, and are not in conflict with any law or regulation applicable to Buyer or the terms of Buyer's partnership documents or articles of incorporation, charter or bylaws, as applicable, or of any indenture, agreement or undertaking to which Buyer is a party or by which it or any of its assets is bound.

4.2    No Conflict.  Buyer's review of Account and Cardholder information will not represent a conflict of interest on the part of Buyer or Buyer's officers or employees, and that neither Buyer nor any of Buyer's affiliated companies is presently a party to any litigation, or involved in any litigation, with any Cardholder or with the Bank.

The execution and delivery of this Agreement by Buyer and the performance of its obligations hereunder will not (i) conflict with or violate (A) the organizational documents of Buyer, or (B)

NCO 00017

any provision of any law or regulation to which Buyer is subject, or (ii) conflict with or result in a breach of or constitute a default (or any even which, with notice or lapse of time, or both, would constitute a default) under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it is bound or any order or decree applicable to Buyer or result in the creation or imposition of any lien on any of its assets or property. Buyer has obtained all consents, approvals, authorizations or orders of any court or governmental agency or body, if any, required for the execution, delivery and performance by Buyer of this Agreement.

4.3    _Investigation of Accounts_.  Buyer is a sophisticated investor and its bid and decision to purchase the Accounts are based upon its own independent expert evaluations of the nature, validity, collectibility, enforceability and value of the Accounts.  The Buyer has had sufficient opportunity to complete the independent investigation and examination into the Accounts that Buyer deems necessary.  Buyer enters into this Agreement solely on the basis of that investigation and Buyer's own judgment.  Buyer has made an independent determination that the Purchase Price represents the Accounts' fair and reasonable value.  Buyer is not acting in reliance on any representation by the Bank, except those listed in Section 3.3.

4.4    _Accounts Sold As Is_.  Buyer acknowledges and agrees that except for warranties and representations set forth in Section 3.3 of this Agreement, Bank has not and does not represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of any of the Accounts and supporting documentation provided by Bank to Buyer, and, subject to the terms of this Agreement, all documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to Buyer with respect to any and all Accounts is sold, transferred, assigned and conveyed to Buyer on an "AS IS, WHERE IS" basis, WITH ALL FAULTS.

4.5    _No Finders_.  Buyer has not utilized any investment banker or finder in connection with the transaction contemplated hereby who might be entitled to a fee or commission upon consummation of the transactions contemplated in this Agreement.

5.    CONDITIONS PRECEDENT TO PURCHASE AND SALE OF ACCOUNTS

5.1    _Representations and Warranties_.  The representations and warranties of the Bank and Buyer in this Agreement will be true and correct as of the Closing Date.

5.2    _Compliance with Covenants and Agreements_.  Buyer and the Bank will have complied in all material respects with each of their respective covenants and agreements in this Agreement on or before the Closing Date.

5.3    _No Violation of Law_.  Consummation by Buyer and the Bank of the transactions contemplated by this Agreement and performance of this Agreement will not violate any order of any court or governmental body having competent jurisdiction or any law or regulation that applies to Buyer or the Bank.

ncopcapcbsd#2-0904.doc

NCO 00018

5.4    <u>Reassignment and Removal from Trusts</u>.  As of the Closing Date (i) any outstanding Account receivables owned as of the Closing Date by Bank are not securitized or will have been reassigned to the Bank, and (ii) all conditions precedent for removal of such receivables from Standard Credit Card Master Trust will have been satisfied.  In the event that this condition cannot be satisfied prior to the Closing Date, this Agreement shall terminate, Buyer's deposit shall be returned to Buyer and the Bank shall have no further obligation to Buyer hereunder.

5.5    <u>Approvals and Notices</u>.  All required approvals, consents and other actions by, and notices to and filings with, any governmental authority or any other person or entity will have been obtained or made. If Buyer is a corporation, Buyer will have delivered to the Bank a certificate from Buyer's corporate secretary (or other documentation satisfactory to the Bank and its counsel) certifying that Buyer's board of directors has resolved or consented to Buyer entering into this Agreement and consummating the transactions contemplated hereby.

5.6    <u>UCC Financing Statements</u>.  Buyer will prepare on or after the Closing Date, as the parties hereto shall agree, such UCC Financing Statements for filing in such jurisdictions as the Buyer may deem necessary or appropriate.  The UCC Financing Statements shall be for notice purposes only and shall expressly indicate that UCC Financing Statements are for notice purposes only and creates no security interest in the assets, property or interests of the Bank.

6.    RIGHTS AND OBLIGATIONS OF THE BANK AND BUYER AFTER THE CLOSING DATE

6.1    <u>Notice to Cardholders</u>.  After the Closing Date, the Bank may, but will not be obligated to, give any Cardholder written or oral notice of the transfer of the Cardholder's Account to Buyer at the Cardholder's last known address.  At Buyer's reasonable request, the Bank will provide a form letter that Buyer may send to a Cardholder to confirm that the Bank sold the Cardholder's Account to Buyer. The Bank shall have the right to review and approve, which approval will not be unreasonably withheld, all written notices sent by the Buyer to the Cardholder informing the Cardholder of the transfer of the Cardholder's Account to the Buyer. The Buyer shall not discredit or impugn the reputation of the Bank in any correspondence sent to the Cardholder in connection with the Accounts purchased by the Buyer.

6.2    <u>Retrieval of Account Documents</u>.  After the Closing Date, the Bank will furnish Buyer at no charge with Account Documents that Buyer reasonably requests within 365 days of the Closing Date, up to a maximum number of Account Documents equal to 10% of the Accounts purchased.  The Bank will charge $5.00 for each Account Document furnished on Accounts in excess of the 10% threshold, or requested after 365 days of the Closing Date, but prior to three years after the Closing Date. Except in instances of litigation unrelated to collection activity or accounts that are within the statute of limitation at the time requested, the Bank will have no obligation to provide Buyer with Account Documents after three years after the Closing Date. Documents will be furnished within 45 days of the date of the request. Buyer's request for an Account Document must be presented to Bank on a form provided by Bank and must be made

ncopcapcbsd#2-0904.doc

NCO 00019

with sufficient specificity to enable the Bank to locate the Account Document. The Bank will use reasonable diligence to provide the Account Document. The failure of the Bank to provide an Account Document requested by Buyer will not be a breach of this Agreement. If the Bank cannot reasonably provide an Account Document that the Buyer requests, the Bank will inform Buyer accordingly, and at Buyer's request, provide an Affidavit in the form shown in Exhibit 3, as a substitute Account Document in accordance with the terms of this paragraph, provided that the parties will mutually agree to a timeframe within which affidavits given in lieu of Documents will be produced.

Buyer may, in addition to its request for Account Documents, request an Affidavit from Bank, in the form shown in Exhibit 3, indicating the date the Account was opened, the Account number and the balance existing as of a specified date. The Bank will provide a total number of affidavits equal to one percent (1%) of the total accounts purchased. The Buyer shall be limited to one request for affidavits per week with a maximum of 100 accounts per request. Bank shall have three (3) weeks to complete the affidavits requested. Requests shall contain sufficient information about the relevant accounts to allow Citibank representatives to locate the Account information to complete the affidavits. The Buyer shall pay Bank $10.00 per affidavit requested and provided. Payment shall be due at the time the affidavit is provided.

6.3    Credit Bureau Reporting. The Bank shall promptly request that the major credit reporting agencies (including, without limitation, Experian, CBI and Trans Union) delete the Accounts from their records. The Buyer may report its ownership of the Accounts to credit reporting agencies provided that the Buyer agrees to comply with the Fair Credit Reporting Act (FCRA) and any other laws or regulations governing credit agency reporting.

6.4    Compliance with Law. With respect to any Account, Buyer or Buyer's agent will at all times: (a) comply with all state and federal laws applicable to debt collection, including, without limitation, the Consumer Credit Protection Act, the Fair Credit Reporting Act and the Fair Debt Collection Practices Act, and (b) for any Account where the statute of limitations has run, not falsely represent that a lawsuit will be filed if the Cardholder does not pay.

6.5    Post Closing Account Review. Prior to initiating any contact, whether verbal, written or electronic, with the Cardholder, Buyer shall review the portfolio through a competent third party vendor (e.g., Banko, Inc.) or other process to discover whether any Accounts included are involved in an open bankruptcy case or have not been discharged in bankruptcy (the "Post Sale Scrub") or if available from the third party vendor have indicators, notes or flags that demonstrate that the Cardholder claims to be a victim of identity theft. The Buyer shall immediately notify Bank of any Accounts that have flags or indicators of identity theft and Buyer shall sell the Accounts back to Bank prior to Buyer contacting Cardholders. Furthermore, Buyer shall immediately cease any collection efforts upon receiving notice (whether from the Cardholder, the Seller, or a third party on behalf of the Cardholder) that a Cardholder has discharged the debt in bankruptcy, and shall not re-commence collection activity until Buyer has conducted a reasonable investigation into the Cardholder's claim and determined, based upon reasonable evidence, that the Cardholder's claim is unfounded.

ncopcapcbsd#2-0904.doc

NCO 00020

6.6    <u>Notice of Claims</u>.  Buyer will notify the Bank immediately of any claim or threatened claim against the Bank, or any claim or threatened claim that may affect the Bank, that is discovered by Buyer.  The Bank will use its reasonable efforts to promptly notify the Buyer of any notice it receives that an account is subject to Bankruptcy protection.

6.7    <u>Seller As Witness</u>.  If Buyer, upon reasonable written notice to Seller, requests or subpoenas an officer or employee of Seller to appear at a trial, hearing or deposition concerning an Account to testify about the Account, Seller shall ensure the requested employee appears at such hearing or deposition and will be available for consultation with Buyer.  Buyer will pay Seller for the officer's or employee's time in traveling to, attending and testifying at the trial, hearing or deposition, whether or not the officer or employee is called as a witness, at the hourly rate equivalent of such officer or employee.  Buyer will also reimburse Seller for the officer's or employee's reasonable out-of-pocket, travel-related expenses.

7.    USE OF BANK'S NAME

7.1    <u>Use of Names</u>.  The Buyer will not use or refer to the name "Citibank," "Citibank Classic," "Citicorp," "Citigroup", "Associates Capital Bank, Inc.", "Associates Credit Card Services, Inc.", "Associates Commerce Solutions", "Associates National Bank", "Universal Card Services Corp." or any similar name or successor corporation, except to reference "Citibank" for purposes of identifying an Account in communications with the Account's Cardholder, in collecting amounts outstanding on the Account, and in conducting litigation or participating in a bankruptcy proceeding with respect to the Account.  Buyer shall not represent that there is an affiliation or agency relationship between Buyer and the Bank, nor shall Buyer state or represent in any way that it is acting for or on behalf of the Bank.  Buyer shall not misrepresent, mislead or otherwise fail adequately to disclose its ownership of the Accounts.

7.2    <u>Breach</u>.  Buyer and the Bank acknowledge that Buyer's breach of this Article 7 will result in actual and substantial damages to the Bank, the amount of which will be difficult to ascertain with precision.  Therefore, if Buyer breaches this Article 7, Buyer will pay the Bank the sum of $10,000.00 for each breach (each breach being the single use of the above names, communicated to a third party as described above) as liquidated damages and in preventing Buyer's further breach of this provision.

8.    THE BANK'S RIGHT TO REPURCHASE ACCOUNTS

8.1    <u>Accounts Affected</u>.  The Bank shall have the right to repurchase any Account that has not been paid in full, released or compromised by Buyer, if the Bank determines that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal proceeding or investigation relating to an Account or a Cardholder, and naming the Bank or otherwise involving the Bank's interest therein in a manner unacceptable to the Bank, or the Bank otherwise determines (in its sole discretion) that such matter cannot be resolved and/or that the Bank's interest therein cannot be adequately protected without the Bank owning such Account.

8.2    Right to Repurchase.

(a)    Upon notice to Buyer, the Bank may repurchase any Account described in Section 8.1 by repaying to Buyer the Adjustment Amount associated with the repurchased Account.

(b)    Upon delivering to the Bank a full accounting of the Account, Buyer may retain any money or value that Buyer collected or received on the Account before Buyer's receipt of the Bank's notice electing to repurchase the Account; provided that, after Buyer has received the Bank's notice, Buyer will immediately cease releasing or compromising the Account.

9.    RIGHT OF RESALE

9.1    Sale or Transfer to a Third Party.  Buyer may resell or transfer the ownership of any Account to a third party, including the transfer of Cardholder information (such as names and addresses) to any third party, (each referred to as "Third Party Buyer"); provided, however, that Buyer must conduct commercially reasonable and prudent due diligence of the Third Party Buyer. Buyer shall defend, indemnify and hold harmless Bank from any and all causes of action, claims, expenses or judgments incurred by Bank for which Buyer's Third Party Buyer or any buyer of Third Party Buyer   (collectively referred to herein as "Downstream Buyer") is solely or partially responsible. Buyer shall require all Downstream Buyers to agree to be bound to all of the Buyer's obligations and limitations or remedies, and to acknowledge all of Bank's rights set forth in this Agreement including, without limitation, the Sections in Articles 6, 7, 8, and 9.  All Downstream Buyers' requests for documentation pursuant to Section 6.2 must be made to Bank through Buyer, unless Bank otherwise agrees in writing.  Nothing in this Section 9.1 shall modify the indemnification provisions between Bank and Buyer as set forth in Article 10 of this Agreement.

Furthermore, Buyer shall not resell, transfer, convey or assign the ownership of any Account to Providian Financial Corporation, First Select Corporation (a Providian Financial Company) or Capital One Financial Corporation, for a period of one (1) year from the Closing Date.

9.2    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Buyer and Bank shall enter into an amendment to this Agreement that shall set forth in detail all the Accounts sold ▬▬▬▬  Bank agrees, within thirty (30) days after the effective date of the forgoing amendment, that Bank shall promptly update its internal systems to identify Accounts purchased from Buyer ▬▬▬▬ and hereby agrees pursuant to Section 9.1 above to thereafter interact directly ▬▬▬▬▬ with respect to (i) all requests for documentation pursuant to Section 6.2; and (ii) transfer of post-closing date payments received by Bank pursuant to Section 2.4 less any applicable fees.  Except as specifically set forth in this paragraph, ▬▬▬▬ shall be a Downstream Buyer as defined in this Agreement and Buyer shall continue to be obligated by all terms and conditions as set forth in this Agreement.

ncopcapcbsd#2-0904.doc

NCO 00022

9.3     Exceptions.  Section 9.1 shall not apply to Buyer's sale, pledge or transfer of Accounts to one or more of its wholly owned subsidiaries or affiliates or to a trust or other special purpose vehicle which is wholly owned by such subsidiary for the sole purpose of obtaining financing and/or issuing asset-backed securities secured by such Accounts, provided that Buyer shall give Bank prior notice of the sale, pledge, or transfer under this Section 9.3.

9.4     Pledge and Assignment of Assets.  Notwithstanding any other provision of this agreement, the Seller hereby consents to the Buyer's pledge and assignment of its rights, title and interests in and to the Assets and in and to this Agreement to any lender providing financing for the Buyer's acquisition of the Assets, and agrees that no restrictions or conditions imposed by the Seller pursuant to this Agreement on assignments of the Assets or of Buyer's right in this Agreement shall apply to such lender's rights as a secured party or an assignee.

10.     INDEMNIFICATION

10.1    Indemnification by Buyer.  Buyer hereby agrees to indemnify, defend, and hold harmless the Bank, its parents, subsidiaries and affiliates, and their officers, directors and employees from and against any and all claims, damages, losses, costs or expenses (including any and all reasonable attorneys' and experts' fees), asserted by a third party that Bank might suffer, incur or be subjected to by reason of any legal action, proceeding, arbitration or other claim, whether commenced or threatened, whether or not well grounded and by whomsoever concerned, based upon any breach of this Agreement, or any other act or omission by Buyer, its officers, directors, agents, employees, representatives or any Downstream Buyers with respect to any Account or any party obligated on an Account after the Closing Date; provided, however, that, (i) the Bank notifies Buyer within a reasonable time of any such claim or action, (ii) such claims, damages, losses, costs or expenses are not solely attributable to any negligent act or omission by the Bank, its parent, affiliates, subsidiaries or any of their employees or agents and (iii) the Bank provides Buyer with information that is available to the Bank and is reasonably necessary for Buyer to prosecute its defense of the action.

Buyer shall bear all expenses in connection with the defense and/or settlement of any such claim or suit.  The Bank shall have the right, at its own expense, to participate in the defense of any claim against which it is indemnified and which has been assumed by the obligation or indemnity hereunder; Buyer, in the defense of any such claim, except with the written consent of the Bank, shall not consent to entry of any judgment or enter into any settlement that either: (a) does not include, as an unconditional term, the grant by the claimant to the Bank of a release of all liabilities in respect of such claims, or (b) otherwise adversely affects the rights of the Bank.

10.2    Indemnification by Bank.  Bank hereby agrees to indemnify, defend, and hold harmless the Buyer, its parents, subsidiaries and affiliates, and their officers, directors and employees from and against any and all claims, damages, losses costs or expenses (including any and all reasonable attorneys' and experts' fees) asserted by a third party that Buyer might suffer, incur or be subjected to by reason of any legal action, proceeding, arbitration or other claim, whether commenced or threatened, whether or not well grounded and by whomsoever concerned, based

ncopcapcbsd#2-0904.doc

NCO 00023

upon any breach of this Agreement, or any other act or omission by Bank, its officers, directors, agents, employees, or representatives with respect to any Account or any party obligated on an Account prior to the Closing Date, provided, however, that (i) the Buyer notifies Bank within a reasonable time of any such claim or action, (ii) such claims, damages, losses, costs or expenses are not solely attributable to any negligent act or omission by the Buyer, its parent, affiliates, subsidiaries, transferees, contractors, agents or any of their employees or agent and (iii) the Buyer provides Bank with information that is available to the Buyer and is reasonably necessary for Bank to prosecute its defense of the action.

Bank shall bear all expenses in connection with the defense and/or settlement of any such claim or suit. The Buyer shall have the right, at its own expense, to participate in the defense of any claim against which it is indemnified and the defense of which has been assumed by the Bank's obligation or indemnity hereunder. Bank, in the defense of any such claim, except with the written consent of the Buyer, shall not consent to entry of any judgment or enter into any settlement that either, (a) does not include, as an unconditional term, the grant by the claimant to the Buyer of a release of all liabilities in respect of such claims, or (b) otherwise adversely affects the rights of the Buyer.

10.3    Survival. The provisions of this Article 10 shall survive the termination or expiration of this Agreement.

11.    CONFIDENTIALITY

11.1    Confidential Information. From and after the execution of this Agreement, Buyer hereto shall keep confidential, and shall use reasonable efforts to cause their respective officers, directors, employees and agents to keep confidential, any and all information obtained from the Bank concerning the assets, properties and business of the Bank, and shall not use such confidential information for any purpose other than those contemplated by this Agreement; provided, however, that Buyer shall not be subject to the obligations set forth in the preceding sentence with respect to any such information provided to it by the Bank which either (i) was in Buyer's possession at the time of the Bank's disclosure, (ii) was in the public domain at the time of the Bank's disclosure, or subsequently enters the public domain through no act or failure to act on the part of the Bank, or (iii) is lawfully obtained by Buyer from a third party. Nothing in this Agreement shall be construed to limit Buyer's obligations under the confidentiality agreement entered into between Buyer and the Bank.

11.2    Public Announcement. Neither Buyer nor the Bank shall make any public announcement of this Agreement or provide any information concerning this Agreement or the subject matter hereof to any representative of the news media without the prior approval of the other party. The parties will not respond to any inquiry from public, governmental, or administrative authorities concerning this Agreement without prior consultation and coordination with each other.

11.3    Survival. The provisions of this Article 11 shall survive the termination of this Agreement.

13

ncopcapcbxd#2-0904.doc

NCO 00024

## 12.    GENERAL PROVISIONS

12.1    <u>Applicable Law</u>.  The laws of the State of South Dakota shall govern the enforcement and interpretation of this Agreement and the rights, duties and obligations of the parties hereto.

12.2    <u>WAIVER OF JURY TRIAL</u>.  NOTWITHSTANDING ANYTHING STATED HEREIN, IF EITHER PARTY BRINGS ANY ACTION AGAINST THE OTHER PARTY, WHETHER AT LAW OR EQUITY, REGARDING THE OTHER PARTY'S PERFORMANCE UNDER THIS AGREEMENT OR BRINGS ANY ACTION CONNECTED IN ANY WAY WITH THIS AGREEMENT, THE PARTIES AGREE TO WAIVE TRIAL BY JURY.

12.3    <u>Notices</u>.  All notices or other documents required to be given pursuant to this Agreement shall be effective when received and shall be sufficient if given in writing, hand delivered, sent by overnight air courier or certified United States mail, return receipt requested, addressed as follows:

|  |  |
|---|---|
| If to Bank: | Citibank (South Dakota), National Association<br>Attn:  General Counsel<br>701 East 60th Street North<br>Sioux Falls, SD  57117 |
| And Copies to: | Citicorp Credit Services, Inc. (USA)<br>Attn:  Rob Strub<br>7920 NW 110th Street<br>Kansas City, MO  64153 |
| If to Buyer: | NCOP Capital, Inc.<br>Attn:  Michael Meringolo<br>507 Prudential Road<br>Horsham, PA  19044 |
| And Copies to: | NCOP Capital, Inc.<br>Joshua Gindin, Esq.<br>507 Prudential Road<br>Horsham, PA  19044 |

The parties hereto may at any time change the name and addresses of persons to whom must be sent all notices or other documents required to be given under this Agreement by giving written notice to the other party.

12.4    <u>Binding Nature of Agreement</u>.  This Agreement is and shall be binding upon and inure to the benefit of the parties hereto, and their respective legal representatives, successors and permitted assigns.

ncopcapcbsd#2-0904.doc

NCO 00025

12.5   Assignment.  Neither party may assign this Agreement or any of its rights in this Agreement without the other's prior written consent, except as provided in Article 9 above. Notwithstanding the foregoing sentence, Bank may assign its rights and obligations under this Agreement to any of its affiliates, subsidiaries, or parent corporations without obtaining Buyer's permission or consent.

12.6   Expenses.  Except as otherwise expressly provided in this Agreement, Buyer and the Bank will each bear its own out-of-pocket expenses in connection with the transaction contemplated by this Agreement.

12.7   Entire Agreement.  This Agreement and the Exhibits hereto embody the entire agreement and understanding between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.  The parties make no representations or warranties to each other, except as contained in this Agreement or in the accompanying Exhibit or the certificates or other closing documents delivered in accordance with this Agreement.   All prior representations and statements made by any party or its representatives, whether orally or in writing, are deemed to have been merged into this Agreement, except as otherwise stated in this Agreement.

12.8   Amendment.  Neither this Agreement nor any of its provisions may be changed, waived, discharged or terminated orally.  Any change, waiver, discharge or termination may be effected only by a writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

12.9   Severability.  If any one or more of the provisions of this Agreement, for any reason, is held to be invalid, illegal or unenforceability, the invalidity, illegality or unenforceability will not affect any other provision of this Agreement, and this Agreement will be construed without the invalid, illegal or unenforceable provision.

12.10  Waiver.  Except as required under Section 3.4, no failure of any party to take any action or assert any right hereunder shall be deemed a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

12.11  Headings.  Headings are for reference only, and will not affect the interpretation or meaning of any provision of this Agreement.

12.12  Counterparts.  This Agreement may be signed in one or more counterparts, all of which taken together will be deemed one original.

ncopcapcbsd#2-0904.doc

NCO 00026

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date first written above.

Citibank (South Dakota),
National Association

NCOP Capital, Inc.

By: _____
          (Signature)

Name: _____
          DAVID L. ZIMBECK
          Vice President & General Counsel
          Citibank (South Dakota), N.A.
          Sioux Falls, SD/1251
          605-331-1630
Title: _____

By: _____
          (Signature)

Name: _____

Title: _____

ncopcapcbsd#2-0904.doc

NCO 00027

## EXHIBIT 1
## ASSET SCHEDULE

| LOT # | # OF ACCOUNTS | CURRENT BALANCE |
|-------|---------------|-----------------|
| #7 |  |  |

ncopeapcbsd#2-0904.doc

NCO 00028

**EXHIBIT 2**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT is dated as of _____ between Citibank (South Dakota), National Association, a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, SD 57117 (the "Bank") and _____, a _____ corporation, located at _____ _____ ("Buyer").

For value received and subject to the terms and conditions of the Purchase and Sale Agreement dated _____, between Buyer and the Bank (the "Agreement"), the Bank does hereby transfer, sell, assign, convey, grant, bargain, set over and deliver to Buyer, and to Buyer's successors and assigns, the Accounts described in Section 1.2 of the Agreement.

This Bill of Sale, Assignment and Assumption Agreement is executed without recourse and without representations or warranties including, without limitation, warranties as to collectibility.

_____     _____

By: _____     By: _____
      (Signature)                                   (Signature)

Name: _____     Name: _____

Title: _____     Title: _____

ncopcapcbsd#2-0904.doc

NCO 00029

EXHIBIT 3

AFFIDAVIT

State of _____

County of _____

Name:                                              Account No:
                                                    Social Security No:

_____, being sworn, deposes and says that the affiant making this
affidavit is an employee of Citicorp Credit Services, Inc. (USA), (the "Company"), which is
located at 7920 NW 110th Street, Kansas City, MO 64153. The affiant is authorized to make
the statements and representations herein. The Company's business records show that as of
_____, there was due and payable from Account # _____ the amount of
$_____. The Company's business records show that this Account was opened or acquired on
_____. The affiant states that to the best of affiant's knowledge, information and
belief there are no uncredited payments against the said debt.

Dated this _____day of _____,_____

                              _____
                              The Company


                              By:_____
                              Printed Name: _____

Subscribed to and sworn to before me this _____day of _____, _____by
_____, _____of the Company.
                                              (Title)


                              _____
                              Notary Public

NCO 00030

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT is dated as of September 30, 2004, between Citibank (South Dakota), National Association, a national banking association organized under the laws of the United States, located at 701 East 60th Street North, Sioux Falls, SD 57117 (the "Bank") and NCOP Capital, Inc., a Nevada corporation, located at Hughes Center, Suite 460, 3993 Howard Hughes Parkway, Las Vegas, NV 89109 ("Buyer").

For value received and subject to the terms and conditions of the Purchase and Sale Agreement dated September 30, 2004, between Buyer and the Bank (the "Agreement"), the Bank does hereby transfer, sell, assign, convey, grant, bargain, set over and deliver to Buyer, and to Buyer's successors and assigns, the Accounts described in Section 1.2 of the Agreement.

This Bill of Sale, Assignment and Assumption Agreement is executed without recourse and without representations or warranties including, without limitation, warranties as to collectibility.

Citibank (South Dakota),
National Association

By: _____
              (Signature)

              DAVID L. ZIMBECK
         Vice President & General Counsel
            Citibank (South Dakota), N.A.
               Sioux Falls, SD/1251
                  605-331-1630
Name: _____

Title: _____


NCOP Capital, Inc.

By: _____
              (Signature)

Name: _____Joshua Gindin_____

Title: _____EVP_____


ncopcapcbsd#2-0904.doc

NCO 00031



Citibank (South Dakota), N.A.

P.O. Box 6000
Sioux Falls, SD 57117-6000

## POWER OF ATTORNEY FOR COLLECTION ACCOUNTS

This Power of Attorney is being executed and delivered by the undersigned, Citibank (South Dakota), National Association, a national banking association ("Seller" or the "undersigned") at the closing of the transactions pursuant to that certain Purchase and Sale Agreement dated September 30, 2004, ("Agreement") between Seller and NCOP Capital, Inc. (referred to as "you" or "Purchaser"). Pursuant to the Agreement Seller will sell, transfer and assign to the Purchaser certain credit card accounts receivable, (collectively the "Accounts" and singularly an "Account").

In connection with the foregoing, and to facilitate the collection by Purchaser and its Agent of the Accounts, the undersigned hereby appoints you and NCO Financial Systems, Inc. as Attorney-in-Fact of and for the undersigned in accordance with the following provisions:

1.  **Power of Attorney.** The undersigned hereby appoints you and NCO Financial Systems, Inc. as Attorney-in-Fact of and for the undersigned, with full power of substitution, with all power and authority in the same of the undersigned:

    (a) To make, endorse, accept, receive, sign, seal, execute, acknowledge and deliver notes, assignments, agreements, certificates, hypothecations, checks, bonds, vouchers, receipts, and other written instruments of whatever kind and nature which evidence or are related to the Accounts and any property given in pledge or security therefore; and

    (b) To deposit and withdraw for your own use, in either the undersigned's name or your name, or jointly in both our names, any funds, monies or properties which may come into your hands and which are proceeds from, or other payment upon, any account purchased under the terms of the Purchase and Sale Agreement dated September 30, 2004, between the parties.

2.  **Governing Law.** This Power of Attorney shall be construed In accordance with the laws of the State of South Dakota applicable to agreements made and to be performed entirely within such State.

3.  **Authority.** This instrument constitutes a representation of the authority of the undersigned to execute and deliver this Power of Attorney.

Citibank (South Dakota),
National Association

By: _____

Its: _____
DAVID L. ZIMBECK
Vice-President & General Counsel
Citibank (South Dakota), N.A.
Sioux Falls, SD/1251
605-331-1630

ncopcapcbsd#2-0904.doc

A member of citigroup

NCO 00032